10 P.3d 977 (2000)
141 Wash.2d 798
STATE of Washington, Respondent,
v.
Cecil Emile DAVIS, Appellant.
No. 66537-1.
Supreme Court of Washington, En Banc.
Argued May 25, 2000.
Decided September 28, 2000.
*985 Ronald D. Ness & Assoc., Ronald Ness, Judith Mandel, Port Orchard, for Appellant.
Cecil Emil Davis, Walla Walla, Pro se.
John Ladenburg, Pierce County Prosecutor, Barbara L. Corey-Boulet, John C. Hillman, Deputies, Tacoma, for Respondent. *978 *979 *980 *981 *982 *983
*984 SMITH, J.
Appellant Cecil Emile Davis appeals his Pierce County Superior Court conviction and sentence for aggravated first degree murder. The jury, after finding Appellant "guilty" in the guilt phase of trial on February 6, 1998, determined in the penalty phase of trial on February 12, 1998 that he did not merit leniency. The trial court on February 23, 1998 sentenced Appellant to death as required by statute. This Court's mandatory review under RCW 10.95.100 began on March 2, 1998 upon filing of the notice of judgment and sentence imposing death.

QUESTIONS PRESENTED
The questions presented in this case are:

(GUILT PHASE)
(1) Whether, under the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 3 and 22 of the Washington Constitution, the trial court erred in not sua sponte questioning prospective jurors concerning racial bias during voir dire examination and in not instructing the jury to exclude consideration of race as a factor in the case;
(2) Whether, under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution, the trial court erred in admitting the testimony of prosecution witness Keith D. Burks; and whether the trial court erred in allowing prosecuting attorneys to ask Mr. Burks on redirect examination, "With the people that you hang out with, is it a good thing or a bad thing to be labeled a snitch?";
(3) Whether, under the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 3 and 22 of the Washington Constitution, the trial court erred in admitting the testimony of prosecution witness Asil Hubley;
(4) Whether the trial court erred in admitting a videotape of the crime scene;
(5) Whether the trial court erred in refusing to admit unauthenticated Washington State population statistics obtained from the Internet;
(6) Whether the trial court erred in denying Appellant's challenge to juror Number 6 and whether certain prospective jurors were properly excused for cause;
(7) Whether the trial court erred in not inquiring into the potential conflict of interest arising out of possible prior representation *986 of a "jailhouse informer" by defense counsel's public defense office;
(8) Whether the trial court erred in giving jury instruction Number 13 on aggravating circumstances and jury instruction Number 20 on requirements for conviction;

(PENALTY PHASE)
(9) Whether, under the Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 14 and 22 of the Washington Constitution, Appellant was denied a fair trial because of prosecutorial misconduct in statements by prosecuting attorneys during the penalty phase of the trial; and
(10) Whether, under the Fourteenth Amendment to the United States Constitution, Appellant's sentence of death was the result of prejudice which denied him a meaningful proportionality review mandated by RCW 10.95.130.

STATEMENT OF FACTS
On January 25, 1997, the body of sixty-five-year-old Ms. Yoshiko Couch[1] was discovered in the upstairs bathtub of her home in Tacoma, Washington.[2] Her body was found lying on its back, with the legs apart, submerged in bloody water approximately five to six inches deep.[3] In the bathtub were biological tissue (blood clot),[4] fecal matter,[5] and Ms. Couch's undergarment.[6] Wet towels and clothing were piled on top of the head and chest areas emitting a strong chemical odor.[7] The body was not clothed from the waist down. A gold wedding band Ms. Couch wore on her left ring finger was missing.[8]
The events surrounding Ms. Couch's death began the night before on January 24, 1997. That night there was a gathering of people at the house Appellant Davis lived in which was owned by his mother, Ms. Cozetta L. Taylor, located at 2012 East 57th Street in Tacoma, Washington.[9] It was across the street and one house over from Ms. Couch's residence at 2007 East 57th Street.[10]
At approximately 2:30 o'clock the morning of January 25, 1997, Appellant, Co-defendant George Anthony Wilson, and Keith D. Burks, Appellant's seventeen-year-old friend and a recent acquaintance of Mr. Wilson, were smoking cigarettes on the porch of Ms. Taylor's house.[11] Appellant was wearing brown suede gloves at the time.[12] In the presence of Mr. Wilson and Mr. Burks, Appellant said "I need to rob somebody,"[13] as he looked in the direction of Ms. Couch's residence across the street.[14] Then Ms. Lisa R. Taylor, Appellant's sister, came outside and told the men to come inside because she was locking the house for the night.[15] Shortly after that Appellant said "I need to kill me *987 a motherfucker."[16] Mr. Burks went back inside the house, while Appellant and Mr. Wilson remained outside.[17]
About five or six minutes later, Mr. Wilson came to the sliding glass door at the back of the house appearing wide-eyed and scared.[18] Mr. Burks unlocked the door and let him in.[19] According to Mr. Burks, Mr. Wilson told him he and Appellant "went over there to rip the lady off, but [Appellant] just kicked in the door and started beating on her and rubbing [her] all over."[20] Mr. Wilson told Mr. Burks the woman was coming down the stairs,[21] and that Appellant rubbed her breasts.[22] He identified Ms. Couch as "the old woman across the street."[23] He also told Mr. Burks that as soon as he realized what Appellant was doing to the woman, he left the Couch residence.[24] Mr. Burks went to sleep after listening to Mr. Wilson's statements.[25] At a later date, Mr. Burks made two statements to police authorities.[26]
Later that morning, at approximately 11:00 o'clock, Jack A. Schauf and his wife, Ms. Asako Schauf, arrived at the Couch residence.[27] They were scheduled to pick Ms. Couch up to attend a dance recital.[28] Ordinarily she would be ready and waiting for them whenever they gave her a ride. But on that day she was not waiting for them.[29]
The front door opened inward as Ms. Schauf knocked on it.[30] There was no damage to the front screen door.[31] Mr. Schauf entered the Couch residence with his wife.[32] The Schaufs noticed wood chips and a striker plate from the doorsill on the floor.[33] They went upstairs and took a cursory look around.[34] Ms. Schauf, followed by her husband, proceeded to check on the physically disabled Richard Couch, husband of Ms. Couch, whose bedroom was located downstairs.[35] Mr. Schauf then went back upstairs and looked into a bedroom and the living room and noticed a white-powdery substance scattered around.[36] Upon entering the bathroom adjacent to the kitchen, he found the body of Ms. Couch in the bathtub.[37] Mr. Schauf felt Ms. Couch's stomach and concluded she was dead.[38]
At the time of the incident, Mr. Couch had a heart condition and was disabled from several *988 strokes.[39] The left side of his body was paralyzed.[40] He was only able to walk a few steps with assistance and was not able to walk up the stairs.[41] He also took prescribed medication to help him sleep.[42] He was not aware of what happened in his home that morning. When Mr. Schauf went to use the telephone in Mr. Couch's bedroom to call 911, he found the telephone, normally on a table next to the bed, in a closet three to four feet away from the bed.[43] Mr. Couch was not informed of his wife's death until after members of the Tacoma Fire Department Paramedic Unit arrived and confirmed she was dead.[44]
Richard Couch was retired from the United States Army. His wife was a homemaker and his primary caregiver.[45] She did all the household shopping and purchased groceries at military commissaries in Pierce County.[46] She had recently purchased Kool Mild cigarettes and cans of Pepsi Cola for her husband, and small packages of meat and poultry, enough to feed two people.[47] At the time of the incident, there were cans of Budweiser Light beer in the home.[48] Ms. Couch always had cash on her person, either in the inside pocket of her purse or in an envelope.[49] The Couches kept to themselves and had no African American friends who visited their home.[50]
Tacoma Police Department forensic specialist Ms. Toni Wentland collected some hairs, fibers, and suspected blood from Ms. Couch's mattress and bedcovers.[51] Forensic specialist Eric Berg gathered several pieces of evidence at the crime scene which included a utility box housing the telephone and television cables located on the outer left front corner of the Couch residencecut marks on the telephone cable indicating an attempt to cut the telephone line;[52] a completely severed television cable;[53] a container of Comet cleanser recovered from the east bedroom;[54] a white powdery substance, believed to be Comet cleanser, scattered mainly throughout the upstairs area of the house;[55] a damp sponge with a gritty white powdery residue found on the railing at the top of the stairs;[56] a similar white powdery residue found on Ms. Couch's body below the waist;[57] Ms. Couch's open purse, with no money in it, on the hallway floor outside the doorway to the southeast bedroom[58] and a sleeping bag with a large amount of biological tissue (blood clot) recovered from the bed in the southeast bedroom.[59]
*989 Forensic specialist Eric Berg did a thorough forensic investigation of the upstairs bathroom where Ms. Couch's body was found. He observed a glove print on the bathroom mirror. In his opinion it was left by a leather glove.[60] No fingerprints were recovered.[61] Mr. Berg noticed a very strong chemical odor in the bathroom and determined the odor was consistent with the household cleanser "Goof-Off."[62] A can of "Goof-Off" was found on the bathroom floor at the base of the bathtub.[63] A plastic container with a scouring pad was also found there.[64] The body of Ms. Couch was photographed as it was found in the bathtub. The entire crime scene, including the body, was photographed and videotaped before any evidence was collected.[65]
On January 27, 1997, Pierce County Associate Medical Examiner Roberto Ramoso, M.D. performed an autopsy on Ms. Yoshiko Couch.[66] Dr. Ramoso concluded the cause of her death was asphyxia by suffocation and neck compression and also xylene toxicity.[67] He estimated the time of death at approximately 3:00 o'clock the morning of January 25, 1997.[68]
Medical Examiner Ramoso observed bruising around Ms. Couch's eye area and hemorrhaging beneath her upper lip, indicating trauma caused by a blunt impact or pressure on her face.[69] He also observed redness and blistering around her chin, neck, and upper torso areas.[70] Portions of her face and hands showed deformation of the skin and changes in the structure of the tissue underneath the skin.[71] Those symptoms were consistent with skin coming in contact with the chemical xylene.[72] In addition, a whitish dried secretion found on the inside of her nostrils was consistent with inhalation of xylene through the nose with some xylene going into the nostrils.[73] Dr. Ramoso noted a strong odor emanating from the towels and clothing which accompanied Ms. Couch's body to the morgue.[74] He drew blood samples from the body for a toxicologist to analyze and examine for the presence of xylene.[75]
Also observed by Dr. Ramoso was evidence of trauma to Ms. Couch's vagina.[76] The trauma consisted of a laceration wound, approximately one and three-quarters of an inch long, caused by a hard object, not a penis, penetrating the vaginal wall.[77] The blood flow from the laceration indicated it was caused before Ms. Couch died.[78] Dr. Ramoso testified the large amount of blood from such a vaginal laceration is consistent with the amount of blood found on the sleeping bag in the southeast bedroom.[79]
The Washington State Toxicology Laboratory analyzed the blood[80] and pubic hair and head hair samples[81] taken during the autopsy of Ms. Couch. The analysis revealed *990 her blood contained 21.2 milligrams per liter of xylene.[82] Medical literature indicates that fatalities due to xylene exposure occur with concentrations of the substance between 3 to 40 milligrams per liter.[83] Death occurs in minutes if xylene is inhaled by a person from a cloth held in front of the face.[84] Xylene is the active ingredient in the household cleanser "Goof-Off."[85] In Dr. Ramoso's opinion, the xylene in Ms. Couch's blood was most likely introduced by inhalation and skin absorption.[86]
The Washington State Patrol (WSP) Crime Laboratory examined the hairs recovered from the crime scene and determined certain hairs had "Negroid" characteristics.[87] The samples with Negroid characteristics were items B-6, B-7 and A-11.[88] Appellant and George Anthony Wilson are African American.[89] Control samples of pubic and head hairs from Ms. Couch, Appellant and Mr. Wilson were compared with the hairs recovered from the Couch residence.[90]
Hair sample item B-6, recovered from a bedspread found in the east bedroom,[91] was inconclusive when compared to the hair samples provided by Appellant and Mr. Wilson. Hair sample item B-7, taken from the bedspread in the southeast bedroom, contained one hair that was microscopically similar to Appellant's head hair sample; he could be considered a possible source of that hair.[92] One hair from hair sample item A-11 was determined to be microscopically similar to Appellant's pubic hair sample.[93] While Appellant's hair samples did not specifically identify him as the source of the hairs recovered from the Couch residence, his hair samples could not be eliminated as a source. Mr. Wilson's hair samples were microscopically dissimilar.[94]
The WSP Crime Laboratory also examined a pair of Appellant's black tennis shoes.[95] Calcium carbonate with a trace amount of copper were found on the shoes.[96] Those chemicals are commonly found in Comet cleanser.[97] Bloodstains were also found on Appellant's left tennis shoe.[98] His shoes were sent to the Genelex Laboratory for DNA (deoxyribonucleic acid) testing, along with blood samples taken from Appellant and Ms. Couch.[99] The laboratory determined the blood found on the shoe was not Appellant's,[100] but was consistent with Ms. Couch's DNA; 1 in 625 persons of Japanese/Asian descent would share this DNA type.[101]
On January 29, 1997, police officers executed a search warrant at Appellant's residence.[102] They recovered several items, including a carton of Kool Mild cigarettes[103] and a package of meat from the freezer in his home with a label which read "$2.60 pork ham slice fresh" and a date of December 11, *991 1996.[104] The Kool cigarette carton did not have a tax stamp, which is consistent with such items sold at the Fort Lewis Commissary.[105] The meat item was packaged and price-marked by the Fort Lewis Commissary.
Appellant was not employed at the time of the incident.[106] His mother, Ms. Cozetta Taylor, and his sister, Ms. Lisa Taylor, did the shopping for their household.[107] They usually purchased large packages of meat, enough to feed at least ten children and three adults. They purchased soda drinks in liter bottles, and not in cans, for the gathering on January 24, 1997.[108] Bottles of Olde English beer were also served at the gathering.[109] No one in the family had military commissary privileges or smoked Kool Mild cigarettes.[110]
Police officers searched a garbage bag located downstairs next to the sliding glass door leading out to the patio area at the back of Appellant's residence.[111] The trash bag contained cigarette butts, a can of Pepsi Cola, a can of Coca-Cola, glass bottles of Olde English beer, cans of Budweiser Light beer and its carton, and Kool Mild cigarette butts, packs and carton.[112] Two latent fingerprints were recovered from the garbage. One fingerprint was taken from an empty Budweiser Light beer carton and matched Appellant's left ring finger.[113] The second fingerprint, lifted from an empty Kool Mild cigarette carton, matched Ms. Couch's left thumb.[114]
In the early morning hours of January 25, 1997, Ms. Jessica Cunningham, Appellant's fourteen-year-old niece, was asleep at Appellant's residence.[115] However, between 3:30 to 4:00 a.m. she awoke and attempted to locate Appellant.[116] Mr. Wilson and Mr. Burks were in the house, but she could not find Appellant.[117]
Later that morning, Appellant was in the kitchen looking out the window at the police investigation across the street.[118] Police officers were talking to one of his neighbors and Appellant observed the neighbor point toward Appellant's residence.[119] Appellant remarked, in the presence of his sister, Ms. Lisa Taylor, "that bitch is next."[120]
Later that day, police officers visited Appellant's residence.[121] He answered the door, did not speak to them and left the house.[122] Appellant returned after the officers left and asked his mother for some Comet cleanser because he wanted to do some cleaning.[123] Appellant obtained a different type of cleaning product and cleaned the downstairs area of the house he lived in.[124] He threw some items into a trash bag in the back yard.[125] He also at least *992 twice washed the clothing he wore on the night of January 24, 1997.[126]
That same day, January 25, 1997, Appellant offered to sell a gold wedding band to his mother for ten dollars.[127] She decline'd and returned it to him.[128] Ms. Lisa Hubley, his niece, observed him wearing a gold wedding band on his "pinky" finger.[129] Appellant was also observed to have in his possession cash, Kool Mild cigarettes, and cans of Coca-Cola, Pepsi Cola, and Budweiser Light beer. He cooked chicken from a package without a store brand-name on it.[130] None of these items had been observed in his possession the day before on January 24, 1997.
A few days after the incident, Appellant told Ms. Kyllo A. Cunningham, his niece, that Ms. Couch was found with towels over her head.[131] That information had not at that time been publicly released by the police.[132]
After the incident, Asil Hubley, Appellant's sixteen-year-old nephew,[133] spoke with Mr. Wilson, whom he considered a close friend,[134] on three occasions regarding the extent of Mr. Wilson's involvement in the incident. On one occasion, Mr. Wilson told Mr. Hubley he had been inside the upstairs bathroom of the Couch residence.[135] On another occasion, Mr. Wilson told Mr. Hubley he stayed on the couch in the house and heard noises coming from the bedroom.[136] On a third occasion, Mr. Wilson told Mr. Hubley he did not go into the Couch home.[137] The second and third statements were made after Mr. Wilson learned the police wanted to talk to him about the incident.[138]
On January 28, 1997, Appellant was arrested and held in the Pierce County Jail.[139] While in custody in early February, he had a conversation with another prisoner, Shelbey B. Johnson.[140] Appellant asked Mr. Johnson if he could read his newspaper.[141] He told Mr. Johnson he had heard "that the newspaper's saying that [Appellant] raped the old bitch, quote, that I may have killed her, but I didn't rape her."[142] Appellant said he would file a lawsuit against the newspaper if it falsely stated he raped the woman.[143]
Appellant on February 3, 1997 was charged by information in the Pierce County Superior Court with aggravated murder in the first degree and, in the alternative, murder in the first degree.[144] The aggravated circumstances included the allegation that the murder was committed in the course of the crime of robbery in the first or second degree, and/or rape in the first or second degree, and/or burglary in the first or second degree or residential burglary.[145] A notice of intent to seek the death penalty was timely filed on June 10, 1997.[146] The information also charged Co-defendant George Anthony *993 Wilson with murder in the first degree.[147] The case was pre-assigned to the Honorable Terry D. Sebring on February 11, 1997.[148] Pretrial motions were heard before Judge Sebring beginning on June 24, 1997.[149] The trial of Appellant and Co-defendant Wilson before Judge Sebring began on November 3, 1997. Judge Sebring became ill during voir dire examination of the jury. Appellant objected to his replacement by another judge.[150] On November 12, 1997, the Honorable Frederick B. Hayes granted a mistrial under Criminal Rule (CrR) 6.11(a).[151]
A new trial began with jury selection on January 5, 1998 before the Honorable Frederick W. Fleming.
Testimony in the guilt phase began on January 22, 1998. On February 6, 1998, the jury returned a verdict of "guilty" of premeditated murder in the first degree with the aggravating circumstances of rape, robbery and burglary,[152] and felony murder in the first degree.[153] On February 9, 1998, Appellant moved to strike the special sentencing proceeding, or in the alternative for a mistrial, alleging inconsistent verdicts.[154] The trial court denied both motions.[155]
The penalty phase of the trial began on February 10, 1998. On February 12, 1998 the jury returned a verdict finding there were not sufficient mitigating circumstances to merit leniency.[156] The trial court on February 23, 1998 sentenced Appellant to be punished by death.[157]

DISCUSSION
Appellant Cecil Emile Davis made assignments of error which may be generally classified under the subjects (1) risk of racial prejudice, (2) admissibility of certain evidence, (3) death qualification of jurors, (4) conflict of interest, (5) jury instructions and (6) prosecutorial misconduct. This Court is required under RCW 10.95.130(1) to review a sentence of death. Most of the assignments of error relate to the "guilt phase" and only a few relate to the "penalty phase."

RISK OF RACIAL PREJUDICE
(1) Whether, under the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 3 and 22 of the Washington Constitution, the trial court erred in not sua sponte questioning *994 prospective jurors concerning racial bias during voir dire examination; and whether the trial court erred in not instructing the jury to exclude consideration of race as a factor in the case.

VOIR DIRE
The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, ..." The Fourteenth Amendment to the United States Constitution provides: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law; ..."
Article I, section 3 of the Washington Constitution provides: "No person shall be deprived of life, liberty, or property, without due process of law." Article I, section 22 of the Washington Constitution provides:
In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel, to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to meet the witnesses against him face to face, to have compulsory process to compel the attendance of witnesses in his own behalf, to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed and the right to appeal in all cases[.] ...
The Sixth and Fourteenth Amendments to the United States Constitution guarantee the right of an accused in all criminal prosecutions to trial by an impartial jury.[158] The Washington Constitution provides a similar guaranty.[159] Under the laws of Washington, the right to a jury trial includes the right to an unbiased and unprejudiced jury.[160] "`The failure to accord an accused a fair hearing violates the minimal standards of due process.'"[161] "[M]ore important than speedy justice is the recognition that every defendant is entitled to a fair trial before 12 unprejudiced and unbiased jurors. Not only should there be a fair trial, but there should be no lingering doubt about it."[162]
The process of voir dire[163] in selecting an impartial jury is stated in CrR 6.4(b) which provides:
A voir dire examination shall be conducted for the purpose of discovering any basis for challenge for cause and for the purpose of gaining knowledge to enable an intelligent exercise of peremptory challenges. The judge shall initiate the voir dire examination by identifying the parties and their respective counsel and by briefly outlining the nature of the case. The judge and counsel may then ask the prospective jurors questions touching their qualifications to serve as jurors in the case, subject to the supervision of the court as appropriate to the facts of the case.

(Emphasis added.)
It is well settled that trial courts have discretion in determining how best to conduct voir dire.[164]Voir dire "`is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'"[165] Although adequate *995 voir dire is not easily the subject of appellate review,[166] it is necessary to discover bias in prospective jurors and to assist the trial court in its responsibility to remove prospective jurors who will not be able to follow its instructions on the law.[167] The trial court's exercise of discretion is limited only when the record reveals that the court abused its discretion and thus prejudiced the defendant's right to a fair trial by an impartial jury.[168] Therefore, absent an abuse of discretion and a showing that the rights of an accused have been substantially prejudiced, a trial court's ruling on the scope and content of voir dire will not be disturbed on appeal.[169]
In this case, Appellant Cecil Emile Davis, an African American male,[170] was found "guilty" of murdering Ms. Yoshiko Couch, a Japanese American female.[171] Appellant contends the crime was "interracial" and for that reason the trial judge was required to question sua sponte[172] prospective jurors about their racial prejudices and instruct them to exclude race as a factor[173] in their deliberations. He argues that, in spite of the decision by his own counsel not to ask such race-related questions of the prospective jurors, the trial court nevertheless was required to act on Appellant's behalf and bring race and ethnicity to their attention.
An accused has the right to carefully examine prospective jurors on voir dire to an extent necessary to afford the accused "every reasonable protection."[174] Appellant does not contend he was denied or otherwise limited in the exercise of this right.
During voir dire, the trial court allowed the lawyers to question prospective jurors about racial bias or prejudice.[175] At no time during voir dire did the court deny Appellant's counsel an opportunity to question prospective jurors concerning their views on racial prejudice, but his counsel asked no such questions.[176] Nor did Appellant's counsel object during voir dire to the manner in which it was being conducted.[177] The trial court allowed individual voir dire of each prospective juror, out of the presence of other prospective jurors, by both parties and gave each side wide latitude on the topics and range of inquiry. The subject of "race" was mentioned thirteen times during the nine days of voir dire. In each instance the subject arose in response to questions by the prosecuting attorneys.[178]
*996 The United States Supreme Court has acknowledged "there is some risk of racial prejudice influencing a jury whenever there is a crime involving interracial violence[.]"[179] However, the Court has also held "[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups."[180] "Individual jurors bring to their deliberations `qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.'"[181] Indeed, capital sentencing necessarily is based on subjective determinations.[182] "Of course, `the power to be lenient [also] is the power to discriminate.'"[183] The question becomes one of determining at what point the risk of racial prejudice becomes constitutionally unacceptable.[184]
In a line of United States Supreme Court cases, racial prejudice has been accepted by the Court as a basis for a constitutional challenge to a trial court's voir dire procedure.[185] The Court has recognized two types of cases concerning the extent of voir dire: cases tried in federal courts,[186] which are subject to the Court's supervisory power; and cases tried in state courts,[187] for which the Court's authority is limited to enforcing provisions of the United States Constitution.[188]
In Connors v. United States, the Supreme Court stated: "`[A] suitable [voir dire] inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by [the juror] of the issues to be tried. That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion. This is the rule in civil cases, and the same rule must be applied in criminal cases.'"[189]
In Aldridge v. United States, the defendant was an African American male and the victim was a Caucasian police officer. Defense counsel requested the trial court to question prospective jurors whether they might be prejudiced against the defendant because of his race. The Supreme Court held it was reversible error for the court not to have posed such a question, observing that "`[t]he Court failed to ask any question which would be deemed to cover the subject.'"[190]
In Rosales-Lopez v. United States, the defendant, a Mexican American, was charged with illegally bringing Mexican nationals into the United States. The Supreme Court held that a federal court must inquire about racial prejudice, not in all cases, but only in cases *997 where the defendant was accused of a violent crime and the defendant and the victim were members of different racial or ethnic groups. Absent such circumstances, the Constitution leaves it to the trial court's discretion to determine the need for such questions.[191]
In Ham v. South Carolina, the Supreme Court explained the kind of circumstances that would require questioning prospective jurors to ensure the jury remains "indifferent" and able to render an unbiased decision. The defendant was an African American civil rights activist accused of marijuana possession. His defense was that law enforcement officers had framed him in retaliation for his civil rights activities and because of his race. The trial court denied the defendant's request to ask questions of prospective jurors concerning racial prejudice. The Supreme Court held the defendant was constitutionally entitled to question prospective jurors about their possible racial prejudice when the factual circumstances of the case raised a "reasonable possibility" that racial prejudice could influence the jury.[192]
In Ristaino v. Ross, the defendant was an African American male convicted of assaulting a Caucasian security guard. Defendant's request to question prospective jurors concerning racial prejudice was denied by the trial court. The Supreme Court held that the trial court must conduct specific questioning to disclose racial bias, when "[r]acial issues [are] inextricably bound up with the conduct of the trial."[193] In that case, notwithstanding that the defendant and the victim were of different races, the Court declined to find the circumstances necessary to compel the trial judge to inquire into the racial biases of prospective jurors. The Court noted generally that the questions to be asked during voir dire are largely discretionary with the trial court and "[t]hus, the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant."[194] The Court observed that the defendant was not singled out for arrest or prosecution because of his race and it was mere happenstance that he was of a different race than the victim.
In Turner v. Murray, the defendant was an African American male charged with capital murder for shooting the Caucasian proprietor of a jewelry store. The trial court precluded the defendant from asking questions of prospective jurors concerning their possible racial prejudice. The jury convicted the defendant and sentenced him to death. The Supreme Court vacated the death sentence, holding that, upon defendant's request, "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias."[195] In that case, the Court announced guidelines for determining whether questioning of jurors on race is mandatory. "`The broad inquiry in each case must be ... whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as indifferent as [they stand] unsworne.'"[196] However, the Court did not reverse the defendant's conviction and found that, with respect to the guilt phase of the trial, the principles previously articulated in Ristaino should continue to be followed.[197] But the Court did reverse on the penalty phase.
In addition, the United States Supreme Court has acknowledged the reluctance of trial judges to question prospective jurors about racial prejudice for fear such an inquiry would improperly inject the issue of race into a case and create the impression "that justice in a court of law may turn upon the pigmentation of skin [or] the accident of birth."[198] The Court has recognized the conflict *998 between this justifiable hesitancy by trial judges and the need to discover jurors who might be disqualified because of racial or ethnic prejudice.[199] The question whether the trial court must inquire into any possible racial prejudice against the defendant, upon the defendant's request, has been addressed by the United States Supreme Court in two criminal case contexts: noncapital cases and capital cases.
In noncapital criminal cases, "special circumstances" under which the federal constitution requires questioning on racial prejudice were described in Ristaino v. Ross.[200] Special circumstances exist if racial issues are "`inextricably bound up with the conduct of the trial.'"[201] However, the Court held that in the absence of special circumstances, the federal constitution does not require voir dire inquiry into the possible racial prejudice of prospective jurors.[202] The Court, in its supervisory capacity, announced a nonconstitutional requirement that federal courts must grant a defendant's request for voir dire inquiry on racial prejudice if the circumstances of the case reveal a "reasonable possibility" that racial or ethnic prejudice may influence the jury.[203]
The Supreme Court held that a situation involving the "reasonable possibility" of racial or ethnic prejudice may arise when a defendant is accused of a violent crime and the defendant and the victim are members of different racial or ethnic groups. Under those circumstances, federal courts must make an inquiry into that possibility.[204] Federal trial courts are held to a higher standard than the United States Constitution requires.[205] The same higher standard applies to Washington State courts under article I, sections 3 and 22 of the Washington Constitution.
Inquiry into possible racial prejudice in capital cases has been allowed in capital sentencing cases.[206] In a capital sentencing hearing (penalty phase), a defendant convicted of an "interracial" murder is entitled to question prospective jurors about possible racial prejudice without regard to the circumstances of the particular case.[207] The Washington statute under which Appellant Davis was sentenced is similar to the Virginia sentencing statute under which the death penalty was imposed in Turner.[208]
In Turner, the United States Supreme Court held that a capital murder defendant "accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias."[209] In a footnote, though, the Court addressed Justice Powell's contention that questioning prospective jurors about their racial prejudice "in the absence of circumstances that make clear a need for it could well have the negative effect of suggesting to the jurors that race somehow is relevant to the case."[210] The Court, in response, stated:

*999 Whether such a concern is purely chimerical or not is a decision we leave up to a capital defendant's counsel. Should defendant's counsel decline to request voir dire on the subject of racial prejudice, we in no way require or suggest that the judge broach the topic sua sponte.[[211]]
(Emphasis added.)
The Court further clarified by stating:
The rule we propose is minimally intrusive; as in other cases involving "special circumstances," the trial judge retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively. Also, a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry.[[212]]
(Emphasis added.)
Turner involved refusal by a trial judge to allow questioning of prospective jurors on racial prejudice during voir dire after it was requested by defense counsel. The Court concluded that federal due process requires that a capital defendant be allowed to question prospective jurors on the issue of racial prejudice. The Supreme Court stated that a capital defendant may not complain about the court's not offering such questions unless the defendant has specifically requested an inquiry. The Court also observed that the decision to question prospective jurors about racial prejudice is best left to defense counsel. "The Constitution, after all, does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury."[213]Turner does not require a trial court to sua sponte question prospective jurors during voir dire concerning the possibility of racial prejudice unless a request is made by the defendant.
In this case, the trial court did not deprive Appellant Davis of his right to a fair trial by an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution. The court had no obligation to raise the question of racial prejudice when it was not requested by the defendant or his counsel.
Appellant concedes the United States Constitution was not offended because there was no denial by the trial court of his right to question prospective jurors about their possible racial prejudice.[214] But he argues the laws of Washington afford him "more stringent procedural safeguards than the federal constitution provides."[215] This Court will not address a claim that the Washington Constitution guarantees more protection than the federal constitution unless the Appellant adequately briefs and argues the Gunwall factors.[216] Appellant has not done so in this case.
Appellant merely claims "the taint of racial bias" played a role in his death sentence because his case showed "compelling need" for questions to prospective jurors about their racial biases and instruction by the trial court to jurors to exclude race as a factor in their deliberations.[217] Appellant attempts to rely upon case law establishing that the federal constitution provides only minimal protection of individual rights and, accordingly, state courts in Washington are not limited in affording greater rights under the Washington Constitution.[218] But he cites no authority for his contention that he was denied a fair trial by an impartial jury in *1000 violation of article I, sections 3 and 22 of the Washington Constitution.
Three broad inquiries are relevant in this case: (1) whether the fact that jurors were not informed of the race of the victim in an interracial crime during voir dire examination negatively affected their impartiality; (2) whether the absence of such information would be cured by instructions from the trial court; and (3) whether, in any event, the absence of such information prejudiced Appellant in this case.

Juror Impartiality
Appellant has not established his claim that "the taint of racial bias" denied him a fair trial by an impartial jury. There is nothing in the record to support his conclusion.[219]
The voir dire in this case extended over nine days and began with a panel of 120 prospective jurors. On January 5, 1998, the trial court read the "Death Penalty, Opening Jury Instruction" to the panel.[220] That same day, the court distributed to the panel the "Juror Questionnaire"[221] and a document entitled "To Prospective Jurors."[222] On January 7, 1998, the court assembled the first six prospective jurors in a jury room and separately called each into open court one at a time. Individual voir dire of each prospective juror by the trial judge, the prosecuting attorneys, Appellant's counsel and co-defendant's counsel continued until 51 prospective jurors were passed for cause, but 2 were later excused, leaving the total at 49.[223]
The State and each defendant were allowed to question each prospective juror. The questioning dealt primarily with their willingness to impose the death penalty, but each juror was questioned about other matters as well,[224] particularly if the juror responded affirmatively to any of the questions on the jury questionnaire. No prospective jurors indicated they had racial bias or prejudice that would impair their ability to render a decision in the case based solely upon the law and the evidence. After peremptory challenges were exercised, 15 jurors were eventually selected.[225] Both Appellant and the State accepted the jury as constituted and neither exhausted the peremptory challenges they were individually allowed.[226] Appellant did not use two remaining peremptory challenges. Appellant cannot establish he suffered any prejudice from the composition of the jury.[227] All the jurors selected *1001 were Caucasian.[228] The mere fact that no African Americans nor Asian Americans were on the jury is not sufficient of itself to establish racial prejudice.[229]
Appellant does not claim that race was a significant factor in his case. On the first day of jury selection, the judge instructed the entire panel of prospective jurors generally that, if they should be selected to serve, their decision must not be based upon bias or prejudice against Appellant.[230] They were then individually questioned. During the lengthy voir dire procedure, the prosecuting attorneys initiated all questioning to determine possible racial bias on the part of each juror. Neither Appellant nor his co-defendant asked any prospective juror about possible racial bias or prejudice. None of counsel raised the issue of race during the remainder of the trial. There is absolutely nothing in the record to support a conclusion the case was racially charged.
While the United States Supreme Court in Turner observed that capital cases are unique and entitle a defendant to further inquiry into the racial prejudice of prospective jurors, the Court determined that the decision by a jury during a sentencing hearing (penalty phase) in a capital case differs from a determination of guilt because the potential is greater, during the sentencing hearing, for outside factors, such as race, to affect the jury's conclusion.[231] The Court stated in a footnote that "we do not retreat from our holding in Ristaino. The fact of interracial violence alone is not a `special circumstance' entitling the defendant to have prospective jurors questioned about racial prejudice."[232]
The mere fact that Appellant and the victim in this case were of different races does not constitutionally mandate voir dire on the issue of race. There is no evidence in the record to suggest that Appellant was singled out because of his race.
The United States Supreme Court has emphasized that "[t]he Constitution does not always entitle a defendant to have questions posed during voir dire specifically directed to matters that conceivably might prejudice veniremen against him."[233] A trial court "retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively."[234]
The trial court in this case did not abuse its discretion. Appellant has not shown that the discretion exercised by the trial court in not sua sponte injecting the subject of race was contrary to, or involved an unreasonable application of, clearly established state and federal law as determined by this Court or the United States Supreme Court.

Jury Instruction on Voir Dire
The trial court is afforded broad discretion in conducting voir dire. Under Turner, a trial court in a capital case need not question prospective jurors sua sponte during voir dire nor instruct the jury to disregard racial considerations where a defendant has not asked for it or for an opportunity to question prospective jurors concerning it.
The decision whether to raise the issue of race, considering the effect such questioning may have in unnecessarily bringing it to the attention of the jurors, is best left to defense counsel. The trial court in *1002 this case did not abuse its discretion by not sua sponte instructing prospective jurors to disregard the factor of race in their deliberations.

Prejudice
Appellant has not established that he was prejudiced by the decision of the judge not to question prospective jurors sua sponte concerning racial prejudice on voir dire or to instruct the jury to exclude race as a factor in their deliberations. There was substantial evidence to support a finding of guilt in this case. There is nothing in the record to suggest the jury improperly considered race in reaching its decision.
Appellant was afforded all his rights under both the United States Constitution and the Washington Constitution.

ADMISSIBILITY OF CERTAIN EVIDENCE

TESTIMONY OF KEITH D. BURKS
(2) Whether, under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution, the trial court erred in admitting the testimony of Keith D. Burks; and whether the trial court erred in allowing the prosecuting attorneys to ask Mr. Burks on redirect examination, "With the people that you hang out with, is it a good thing or a bad thing to be labeled a snitch?"

In this case, Appellant contends the trial court erred in admitting the testimony of Keith D. Burks concerning the events on the morning of January 25, 1997 as told to him by Co-defendant Wilson. He claims the hearsay statement made by Mr. Wilson to Mr. Burks, determined by the trial court to fall within the "excited utterance" exception to the hearsay rule,[235] was not "trustworthy and reliable."[236] In addition, Appellant argues Co-defendant Wilson's hearsay statement to Mr. Burks implicated him in violation of his right to confront the witnesses against him under the Sixth Amendment to the United States Constitution and Washington Constitution article I, section 22.[237]
A defendant may prevail on a claim of prosecutorial misconduct upon showing the conduct of the prosecuting attorney was improper and had a prejudicial effect on the jury's verdict provided an objection is made and a curative instruction is requested unless such an instruction would not cure it.[238] Appellant's claim of prosecutorial misconduct for questioning Mr. Burks is without merit. A criminal defendant's rights under the confrontation clause are not violated when the relator of a hearsay statement admitted under the excited utterance exception is available for cross-examination as a witness under oath and whose demeanor, observations, and perceptions of the events that existed at the time the declarant's statement was made can be assessed by the trier of fact.[239]
Contrary to Appellant's claims, the State argues the trial court properly admitted Mr. Burks' testimony in accord with its determination that the testimony constituted an "excited utterance" under ER 803(a)(2).[240] The State also asserts Mr. Burks' testimony *1003 did not offend Appellant's rights under the confrontation clause because the testimony fell within "a firmly rooted exception to the hearsay rule" and was imbued with "particularized guarantees of trustworthiness."[241]
The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him[.]" Similarly, article I, section 22 of the Washington Constitution provides: "In criminal prosecutions the accused shall have the right to ... meet the witnesses against him face to face[.]" The federal confrontation clause under the Sixth Amendment to the United States Constitution is applicable to the states under the due process clause of the Fourteenth Amendment.[242]
A determination by the trial court that a hearsay statement falls within the excited utterance exception under ER 803(a)(2) will not be disturbed on appeal absent an abuse of discretion.[243]
Appellant relies upon State v. Brown[244] for the proposition that Co-defendant Wilson's statement to Mr. Burks was not trustworthy or reliable, and was improperly construed by the trial court as an "excited utterance" exception to the hearsay rule. The State correctly argues this case is factually distinguishable from Brown.
In Brown, the alleged rape victim reported to police authorities that she was abducted and raped. At a pretrial hearing, the trial court ruled the 911 tape of her telephone call was admissible as an excited utterance exception to the hearsay rule. At trial, the victim testified she had lied to the police about being abducted because she thought they would not take the case seriously, knowing she was a prostitute and had agreed to meet with the defendant to commit fellatio for money. This Court reversed the defendant's conviction, concluding the trial court had abused its discretion in ruling the alleged victim's 911 telephone call was an excited utterance, holding that her testimony evidenced not only the opportunity to fabricate, but represented an actual fabrication of part of her story prior to making the 911 call.[245]
In this case, there was no evidence that Co-defendant Wilson fabricated his statements to Mr. Burks.[246] In addition, Mr. Wilson's statement to Mr. Hubley does not impeach the credibility of his statement to Mr. Burks. Mr. Burks testified that Mr. Wilson told him he was on the porch when Appellant kicked in the front door to the Couch residence and began assaulting Ms. Couch. However, Mr. Wilson did not tell Mr. Burks he did not enter the home. He told him he was on the porch when Appellant kicked in the door. Mr. Burks testified at trial that he did not know whether Mr. Wilson went into the home.[247] Mr. Wilson later told Mr. Hubley on one occasion that he was inside the Couch residence.[248] Mr. Hubley's testimony does not contradict Mr. Wilson's statement to Mr. Burks because he did not deny to Mr. Burks that he went inside the home. The facts in this case are distinguishable from the facts in Brown.
The hearsay rule precludes admission of out-of-court statements to prove the truth of the fact asserted, except as provided by the Rules of Evidence, court rules, or statute.[249] By definition, some out-of-court *1004 statements are not hearsay.[250] Even though hearsay, certain out-of-court statements are admissible as an exception to the hearsay rule.[251]
Under ER 803(a) (2), the excited utterance exception provides:
(a) Specific Exceptions. The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
....
(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.[[252]]
The excited utterance exception is based upon the theory that a statement made as a spontaneous reaction to the stress of a startling event offers little to no opportunity for misrepresentation or conscious fabrication.[253] A hearsay statement qualifies as an excited utterance under ER 803(a)(2) if (1) a startling event or condition occurred, (2) the statement was made while the declarant was under the stress of excitement caused by the event or condition, and (3) the statement relates to the event or condition.[254] Under these principles, the statements of Co-defendant Wilson to Mr. Burks qualify as an excited utterance.
Appellant's brutal attack upon Ms. Couch was a startling event witnessed by Co-defendant Wilson. In his statement to Mr. Burks, he disclosed his own intention to "rip the lady off," but was surprised as Appellant began to beat her and rub her all over.[255] Co-defendant Wilson's reaction to this unexpected turn of events was to leave the Couch residence within minutes of his arrival without taking any property.
Appellant's attack upon Ms. Couch was a startling event creating stress for Co-defendant Wilson. "The key to the second element is spontaneity."[256] Ideally, the statements should be made contemporaneously with or immediately after the startling event, because the opportunity for reflective thought and the danger of fabrication are minimized.[257] The longer the time period between the event and the statement, the greater the need for proof the declarant did not engage in reflective thought prior to making the statement.[258] In addition, other factors surrounding the startling event and the statement may be considered in determining whether the declarant was still under the effect of the excitement caused by the event.[259]
In this case, the time interval between the startling event and the statement was brief. Only five to six minutes passed before Co-defendant Wilson appeared at the sliding glass door at the back of Appellant's residence and told Mr. Burks he left the Couch residence as soon as he realized what Appellant was doing to Ms. Couch.[260] It took Mr. Wilson only about two minutes to cross the street and knock on the back door. The opportunity for him to reflect on the statement was minimal and the evidence supports a conclusion he was under stress when he spoke to Mr. Burks. His appearance and demeanor support a conclusion he was still *1005 reacting to a startling event.[261] His statement explained the facts leading up to the event; Ms. Couch came down the stairs and Appellant beat her and rubbed her breasts; and he reacted to the event by leaving the Couch residence when he realized what Appellant was doing to Ms. Couch.
The requirements for admissibility of an excited utterance as an exception to the hearsay rule under ER 803(a)(2) are satisfied under the evidence in this case since there was a startling event to which the statement related; and the spontaneity of the statement was preserved because the time between the event and the statement was sufficiently slight to ensure that when he made the statement to Mr. Burks, Mr. Wilson was still under the stress of witnessing Appellant's attack upon Ms. Couch.
Appellant's emphasis upon the United States Supreme Court decision in Lilly v. Virginia,[262] in support of his argument that his rights under the confrontation clause were violated, is misplaced.[263] The State correctly asserts Co-defendant Wilson's statement to Mr. Burks did not violate Appellant's rights under the confrontation clause because the statement fell within a "firmly rooted" exception to the hearsay rule, the excited utterance exception under ER 803(a)(2), and contained "particularized guarantees of trustworthiness."
"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."[264] When the State seeks to offer a declarant's hearsay statements against the accused, and the declarant is unavailable, "courts must decide whether the Clause permits the [State] to deny the accused his usual right to force the declarant `to submit to cross examination[.]'"[265] The United States Supreme Court has consistently held that "the Clause does not necessarily prohibit the admission of hearsay statements against a criminal defendant, even though the admission of such statements might be thought to violate the literal terms of the Clause."[266] The Supreme Court has indicated "`a preference for face-to-face confrontation [with witnesses] at trial,'" acknowledging "that such confrontation is [not] an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers."[267]
The Supreme Court adheres to the general rule it articulated in Ohio v. Roberts[268] that admissibility of a hearsay statement does not offend the confrontation clause "if [the statement] bears adequate `indicia of reliability.' Reliability can be inferred... where [the hearsay statement (1)] falls within a firmly rooted hearsay exception [or (2) contains] particularized guarantees of trustworthiness."[269] A hearsay statement that "qualifies for admission under a `firmly rooted' hearsay exception is so trustworthy that adversarial testing can be expected to add little to its reliability."[270] The Supreme Court has stated that the excited utterance exception to the hearsay rule is a "firmly rooted hearsay exception" that carries sufficient indicia of reliability to satisfy the reliability requirements of the confrontation clause.[271]
*1006 In this case, Co-defendant Wilson's statement to Mr. Burks is reliable because it falls within a "firmly rooted" hearsay exception, the excited utterance exception under ER 803(a)(2), and does not offend Appellant's rights under the confrontation clause.
While the Supreme Court has held the indicia of reliability of a co-defendant's confession, which implicated the nontestifying defendant, was sufficiently reliable under the Roberts test,[272] Appellant is correct in his assertion that the Court in Lilly v. Virginia concluded the admission of a nontestifying accomplice's confession in a trial against the defendant violated the defendant's rights under the confrontation clause. However, Lilly is distinguishable from the facts of this case.
In Lilly v. Virginia[273] the confession of a nontestifying accomplice, which implicated the defendant, was admitted against the defendant in a separate trial on the grounds that it satisfied Virginia's "statement against penal interest" exception to the hearsay rule.[274] A plurality of four Justices relied upon "the decisive fact, ... that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence."[275] The Court in Lilly found unreliable an accomplice's confession obtained in police custody because of the accomplice's natural motive to attempt to exculpate himself. In a footnote, the Court referred to Dutton v. Evans[276] as the only exception to its "unbroken line of cases" holding that "the admission of an accomplice's spontaneous comment that indirectly inculpated the defendant did not violate the Confrontation Clause."[277] The Court clarified its holding in Dutton by stating "[w]hile Justice Stewart's plurality opinion observed that the declarant's statement was `against his penal interest,' the Court's judgment did not rest on that point, ... [r]ather, the five Justices in the majority emphasized the unique aspects of the case and emphasized that the co-conspirator spontaneously made the statement and `had no apparent reason to lie.'"[278]
The Supreme Court in Lilly specifically mentioned "spontaneous declarations" as an example of a "firmly rooted" exception to the hearsay rule.[279] Similarly, this Court has determined that admission of a co-defendant's *1007 hearsay statement does not offend the confrontation clause if it falls within a "firmly rooted" hearsay exception.[280] The Roberts test requires that the hearsay exception be firmly rooted or contain particularized guaranties of trustworthiness. Because the excited utterance exception under ER 803(a)(2) is a firmly rooted hearsay exception, Co-defendant Wilson's statement to Mr. Burks satisfies the requirements of Roberts. Inquiry into whether the hearsay statement is trustworthy is not necessary.[281]
In this case, the trial court did not abuse its discretion in finding the testimony of Keith D. Burks admissible under the excited utterance exception to the hearsay rule. Admission of Mr. Burks' testimony at trial did not offend confrontation clause principles because the statement fell within a firmly rooted exception to the hearsay rule. Appellant's right to confront witnesses was not violated in this case.
In addition, Appellant contends the trial court erred in allowing the prosecuting attorneys to ask Keith D. Burks on redirect examination, "With the people that you hang out with, is it a good thing or a bad thing to be labeled a snitch?"[282] Appellant argues "[t]he defense objected to this question," but the trial court overruled the objection and allowed the State to ask it.[283] The State argues, to the contrary, that Appellant Davis did not object to the prosecuting attorney's question, nor to Mr. Burks' response, and only Co-defendant Wilson's counsel made an objection to the question at trial.[284]
The State's version of the trial proceedings concerning this issue is correct. Appellant's counsel made no objection to the question it now argues was erroneously allowed. Without an objection, an evidentiary error is not preserved for appeal.[285] Appellant cannot rely upon the objection of a co-defendant's counsel to preserve an evidentiary error on appeal.[286] This issue is not properly raised before this Court.[287]

TESTIMONY OF ASIL HUBLEY
(3) Whether, under the Sixth and Fourteenth Amendments to the United States *1008 Constitution and article I, sections 3 and 22 of the Washington Constitution, the trial court erred in admitting the testimony of prosecution witness Asil Hubley.
Appellant contends "the prosecutor's conduct in selectively asserting the truthfulness and reliability of [co-defendant] Wilson's `excited utterance' to Keith D. Burks by offering the testimony of Asil Hubley" violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 3 and 22 of the Washington Constitution.[288] Appellant attempts to argue that the trial court erred in admitting the testimony of Asil Hubley. He claims the prosecuting attorney impeached Mr. Burks' testimony by offering the testimony of Mr. Hubley, a witness for the State.[289] The State maintains Appellant's contentions are not correct and the trial court properly admitted the testimony of Mr. Hubley.
During the trial before Judge Fleming, the court allowed the State to ask Mr. Hubley four leading questions.[290] Mr. Hubley's testimony consisted mainly of his responses to those four questions asked by the State on direct examination. The four questions and Mr. Hubley's answers were:
(1) Did [co-defendant] Anthony Wilson tell you at one point that he was inside the bathroom of the woman's [Ms. Couch's] home? ANSWER: Yes.
(2) Did he later tell you that he stayed on the couch in the house and heard noises coming from the bathroom? ANSWER: Yes.
(3) Later still did he tell you he wasn't even inside of her house? ANSWER: Yes.
(4) Were the second and third things that [co-defendant] Anthony Wilson told you after he found out the police were wanting to talk to him about this case? ANSWER: Yes.[[291]]
The ruling by the judge is not quite clear, but Judge Fleming stated "[the four questions are] leading, but ... [the questions] will be allowed in order not to prejudice either side. I'm going to trust that the best interests of the particular defendants will restrict sufficiently cross-examination so as not to offend Bruton.... I'm not restricting the cross-examination."[292] The court advised counsel that if any potential problems arose during the trial, he would excuse the jury, listen to the questions of concern, and entertain an offer of proof as to what reference counsel intended to make regarding Mr. Hubley.
However, Judge Fleming ultimately affirmed his ruling and allowed the four leading questions. Appellant objected to the State's questions and moved to exclude them.[293] Then, Co-defendant Wilson objected to the court's ruling allowing the State to ask Mr. Hubley the leading questions.[294] Later, Appellant objected to use of a redacted statement and moved for severance and mistrial.[295] The court denied both motions and stated that cross-examination of Mr. Hubley would not be limited except Co-defendant Wilson should adhere to the approved redacted version of the statement for cross-examination.[296]
Properly argued at trial and on appeal, the issue quite simply would have been objection to the leading form of the four questions and objection to the inadmissible hearsay the questions presented. But this was not done. Appellant does not make a clear argument on the issue on appeal. Even *1009 assuming it was error to allow the leading questions, the error was harmless.

VIDEOTAPE OF CRIME SCENE
(4) Whether the trial court erred in admitting a videotape of the crime scene.

Appellant claims the trial court erred in admitting a videotape of the crime scene.[297] He points out that several still photographs depicting Ms. Couch's body in the bathtub were admitted into evidence. He claims the videotape, including a 30-second excerpt showing how the body was found in the bathroom, was not probative but duplicative,[298] likely inflamed the jury, and created an impermissible risk that his death sentence was prejudiced.[299] The State contends the trial court properly exercised its discretion in admitting the videotape of the crime scene because it was relevant to the case and not unduly prejudicial.[300]
The decision whether to admit photographic evidence lies within the sound discretion of the trial court.[301] The trial court's decision will not be disturbed on appeal unless there is "a clear showing of abuse of discretion, that is, discretion manifestly unreasonable or exercised on untenable grounds or for untenable reasons."[302] A court abuses its discretion where no reasonable person would adopt such a view.[303] Even gruesome photographs are admissible if the trial court determines their probative value out-weighs their prejudicial effect.[304]
In this case, the trial court did not abuse its discretion because the videotape documented the police investigation at the Couch residence shortly after investigators arrived at the scene.[305] The trial court viewed the videotape in camera and concluded it was not prejudicial and that it merely showed the crime scene and would help to orient the jury to the Couch residence. He concluded it did not unduly emphasize the victim's body disproportionately to the videotape as a whole.[306] The videotape was probative in aiding the jury's understanding of the crime scene. The trial court did not abuse its discretion in admitting the videotape.

WASHINGTON STATE POPULATION STATISTICS
(5) Whether the trial court erred in refusing to admit unauthenticated Washington State population statistics obtained from the Internet.

Appellant contends the trial court erred in not admitting Washington State population statistics.[307] He claims the hard copy printout his counsel obtained from the Internet was a self-authenticating document admissible under ER 902(e).[308] The State argues the trial court did not err in excluding the *1010 document as hearsay not admissible under a recognized exception to the hearsay rule.[309]
The evidentiary rulings of a trial court are reviewed for abuse of discretion.[310] Under ER 802, "[h]earsay is not admissible except as provided by these rules, by other court rules, or by statute." Public records and reports qualify as an exception to the hearsay rule "when duly certified by the respective officers having by law the custody thereof."[311] An unauthenticated printout obtained from the Internet does not meet the public records exception to the hearsay rule under RCW 5.44.040. Nor does it qualify as a self-authenticating document under ER 902(e). Appellant provides no authority to the contrary. The trial court did not abuse its discretion in sustaining the State's hearsay objection to the document.

DEATH QUALIFICATION OF JURORS
(6) Whether the trial court erred in denying Appellant's challenge to juror Number 6 and whether certain prospective jurors were properly excused for cause.

DENIAL OF DEFENSE CHALLENGES FOR CAUSE
Appellant assigns error to the trial court's denial of his challenge for cause against juror number 6.[312] The State maintains the trial court properly exercised its discretion in denying the challenge.[313]
Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution, "a defendant is guaranteed the right to a fair and impartial jury."[314] A party may challenge a juror for cause under Criminal Rule (CrR) 6.4(c). Challenges are governed by statute under chapter 4.44 RCW. Statutes relating to challenges for cause and challenges for bias are:
[RCW] 4.44.160 General causes of challenge. General causes of challenge are:
(1) A want of any of the qualifications prescribed for a juror, as set out in RCW 2.36.070.
(2) Unsoundness of mind, or such defect in the faculties of the mind, or organs of the body, as renders him or her incapable of performing the duties of a juror in any action.
[RCW] 4.44.170 Particular causes of challenge. Particular causes of challenge are of three kinds:
(1) For such a bias as when the existence of the facts is ascertained, in judgment of law disqualifies the juror, and which is known in this code as implied bias.
(2) For the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging, and which is known in this code as actual bias.
(3) For the existence of a defect in the functions or organs of the body which satisfies the court that the challenged person is incapable of performing the duties of a juror in the particular action without prejudice to the substantial rights of the party challenging.
[RCW] 4.44.180 Implied bias defined.
A challenge for implied bias may be taken for any or all of the following causes, and not otherwise:

*1011 (1) Cosanguinity or affinity within the fourth degree to either party.
(2) Standing in the relation of guardian and ward, attorney and client, master and servant or landlord and tenant, to the adverse party; or being a member of the family of, or a partner in business with, or in the employment for wages, of the adverse party, or being surety or bail in the action called for trial, or otherwise, for the adverse party.
(3) Having served as a juror on a previous trial in the same action, or in another action between the same parties for the same cause of action, or in a criminal action by the state against either party, upon substantially the same facts or transaction.
(4) Interest on the part of the juror in the event of the action, or the principal question involved therein, excepting always, the interest of the juror as a member or citizen of the county or municipal corporation.
[RCW] 4.44.190 Challenge for actual bias. A challenge for actual bias may be taken for the cause mentioned in RCW 4.44.170(2). But on the trial of such challenge, although it should appear that the juror challenged has formed or expressed an opinion upon what he may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially.
The trial court's dismissal of a prospective juror in a capital case will not be reversed on appeal absent a manifest abuse of discretion.[315] Prospective jurors may be dismissed for cause if their views would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath.[316] On review, deference is given to the trial court's factual finding that a prospective juror's state of mind with respect to the death penalty was such that they could not try the case fairly and impartially.[317] This deference to trial judges acknowledges the importance of their observations of the jurors' demeanor and the judge's ability to interpret and evaluate the jurors' answers to determine whether they would be impartial.[318] In this case, the trial court properly denied Appellant's challenge for cause against juror number 6.
In In re Lord, this Court affirmed the trial court's refusal to allow a challenge for cause to a juror who, like juror number 6 in this case, initially appeared confused about the jury's penalty phase duties and the applicable law:
Although [the juror's] initial understanding of the procedures involved in a capital trial was confused, the record as a whole demonstrated that his "views [on capital punishment] would [not] `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"[[319]]
In this case, juror number 6 stated that although he favored the death penalty, he was not predisposed to vote for it.[320] Only when defense counsel asked him three different versions of the same question did the juror indicate a predisposition to vote for the death penalty if no mitigating factors were presented.[321] However, after the penalty *1012 phase procedure was explained to the juror, he reiterated that he would follow the law and hold the State to its burden of proof even if the Appellant offered no mitigating evidence.[322] The trial court properly exercised its discretion in not excusing juror number 6.

DISMISSAL OF JURORS
Appellant also argues the trial court erred in dismissing juror number 50 and juror number 38 for cause.[323] The State counters that these jurors were properly dismissed for cause.[324]
The process of death qualifying a jury in a capital case has consistently been upheld by the United States Supreme Court.[325] Jurors may be excused for cause if their views would prevent or substantially impair the performance of their duties as jurors in accordance with the court's instructions and the jurors' oath.[326] This Court has affirmed the trial court's removal of such a juror where the juror's religious convictions would not allow her to impose the death penalty.[327]
In this case, the State challenged juror number 50 for cause and the trial court dismissed her because her responses to questions from both the prosecuting attorneys and defense counsel indicated her religious convictions would not allow her to impose the death penalty, and that, if life without parole were a sentencing option, she would vote for that option.[328] In consideration of her stated religious views, the trial court properly exercised its discretion in excusing juror number 50 for cause.
Similarly, the trial court properly exercised its discretion in granting the State's challenge for cause to juror number 38. Juror number 38 stated he would require "100% proof" before he could impose the death penalty.[329] Because proof beyond a reasonable doubt does not require 100% proof and, after repeated questioning by the court the juror did not seem to grasp the difference between the two standards of proof, the court granted the State's motion to excuse juror number 38 for cause. The trial court did not abuse its discretion.

*1013 CONFLICT OF INTEREST

(7) Whether the trial court erred in not inquiring into the potential conflict of interest arising out of possible prior representation of a "jailhouse informer" by defense counsel's public defense office.

Appellant argues the trial court erred in not inquiring into an alleged conflict of interest involving the Pierce County Department of Assigned Counsel (DAC), and its possible prior representation of the State's witness, Shelby B. Johnson, a "jailhouse informer."[330] He claims that once the trial court obtains information of a potential conflict of interest, the court is required to inquire into the possible conflict to determine whether his rights to effective assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution were violated.[331]
The State contends the trial court had no duty to inquire about a potential conflict,[332] and besides, Appellant has not demonstrated that there was an actual conflict of interest which adversely affected the performance of his lawyers.[333]
The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." The Sixth Amendment right to counsel is assured in state courts by the due process clause of the Fourteenth Amendment.[334] The constitutional right to counsel includes the right to assistance of counsel free from conflicts of interest.[335]
A trial court is not required to initiate an inquiry into a possible conflict of interest unless (1) the court knows of an actual conflict or (2) the court reasonably should know of a conflict.[336] The mere possibility of a conflict of interest is not sufficient to "impugn a criminal conviction."[337] A defendant who does not raise an objection at trial must demonstrate "an actual conflict of interest adversely affected his lawyer's performance" in order to obtain relief on appeal.[338]
Trial courts may assume, absent special circumstances, that the representation of a criminal defendant by one or more lawyers entails no conflict of interest.[339] This assumption is premised upon the necessity that trial courts rely upon the good faith and good judgment of defense counsel.[340]
In this case, the trial court was not advised there was a potential conflict of interest. The record concerning the alleged conflict of interest consists only of the following exchange:[341]
*1014 The State: Next motion, Your Honor, is... a motion to exclude several convictions [of] Shelby Johnson. He is an adult. Shelby Johnson, ... is the witness who had ... a discussion with Cecil Davis in jail about reading the newspaper, and he has multiple felony and misdemeanor convictions that I've listed on page two of the State's motion in limine.
....
The Court: Wait a minute. What about the obstructing? Isn't that the same circumstances that's applicable there or are you seeking to have that?
Appellant's Counsel: Yes, Your Honor. And again, I've ordered the report, that is a more current conviction. When it became obvious that Mr. Johnson was going to be a witness in this, all of our files in our office were sealed, so I again had to order the police reports and don't have it yet and I don't know.[[342]]
Appellant's two lawyers never raised any concern about a possible conflict of interest. Nor did Appellant claim at any time during trial that his legal representation was tainted by conflict of interest. The trial court properly relied upon the judgment of Appellant's own lawyers and had no reason to believe there was a conflict of interest.
Appellant's reliance on Holloway v. Arkansas[343] and In re Personal Restraint Petition of Richardson[344] is misplaced. In this case, the trial court did not commit reversible error by not further inquiring of defense counsel concerning an unidentified possible conflict of interest. Appellant correctly concludes that the United States Supreme Court in Holloway v. Arkansas held that a trial court has an obligation to inquire about a potential conflict of interest "in the face of the representations made by counsel."[345] However, Holloway is distinguishable from this case. That case involved one lawyer representing three defendants at the same trial, each of whom desired to testify at the trial. In that case defense counsel advised the trial court that effective representation was impossible because of the diverging interests of each co-defendant, but the court refused to consider appointment of separate counsel.[346] Defense counsel in Holloway was prevented from cross-examining any of the co-defendants.[347]
The Supreme Court clarified Holloway in Cuyler v. Sullivan, holding that state trial courts may "assume" that defense counsel has no conflict of interest, and that the state trial courts have no duty to inquire unless the court "reasonably should know that a particular conflict exists."[348]
In re Richardson is also distinguishable. In that case, defense counsel represented both the defendant and a witness whom the defendant called to establish a claim of self-defense.[349] When the witness started to testify to self-incriminating information, the conflict of interest was brought to the trial court's attention. The trial court was informed by the witness that he and the defendant shared the same lawyer and the court realized the danger of potential conflict. Instead of allowing the witness to consult a different lawyer, or allowing the defendant to obtain a new lawyer, defense counsel chose not to examine the witness on a key issue pertaining to the self-defense claim and not to elicit testimony from the witness which would have impeached an important witness for the State.[350] This Court, citing Holloway, Sullivan, and Wood,[351] reversed the *1015 conviction and concluded "a trial court commits a reversible error if it knows or reasonably should know of a particular conflict of interest into which it fails to inquire."[352]
Under the facts in this case, unlike Richardson, there was no conflict of interest presented to the trial court.[353] There is nothing in the record to establish that the DAC represented the State's witness, Shelby B. Johnson, in the past. There is merely a reference to possible past DAC representation of a potential State witness. The record does, however, suggest that DAC took steps to avoid any possible conflict by sealing its files. The trial court had no duty to inquire because there was in fact no representation by the defense of even a possible conflict of interest.
"Prejudice is presumed only if the defendant demonstrates that counsel `actively represented conflicting interests' and that `an actual conflict of interest adversely affected his lawyer's performance.'"[354] In this case, Appellant has not established either qualification. On appeal, Appellant merely concludes "[i]t is obvious from this ... [exchange] between the court and the defense counsel that Mr. [Johnson] had been represented by defense counsel."[355] However, there is no record pertaining to Mr. Johnson's legal representation in his criminal case.[356] There is no evidence from the record that either of Appellant's lawyers, both of whom were assigned by DAC, represented Mr. Johnson in his prior case. The record does show, however, that DAC took steps to ensure there was no possible conflict of interest by sealing the files of past clients who were potential witnesses in this case.
Appellant has not established that any alleged conflict of interest adversely affected the performance of his lawyers. A substantial criminal history of dishonesty was introduced against Mr. Johnson.[357] Defense counsel attacked his credibility, suggesting he had lied because Appellant was bothering him.[358] Appellant has not identified any act or omission which would indicate that his own counsel's representation was tainted by conflict of interest because of even a remote connection to the witness.

JURY INSTRUCTIONS
(8) Whether the trial court erred in giving jury instruction Number 13 on aggravating circumstances and jury instruction Number 20 on requirements for conviction.

Appellant argues the trial court erred in not properly instructing the jury concerning aggravating factors for the crime of first degree premeditated murder in jury instruction number 13. Specifically, he objected to the last sentence in jury instruction number 13[359] because "[t]hat particular sentence *1016 is not in the [Washington Pattern Jury Instructions: Criminal] WPIC's, it's added in ... accordance with the case of Jeffries.[[360]] as petition of Jeffries [.]"[361] Appellant asserts that although the trial court's instruction had been modified to comply with the holding in Personal Restraint Petition of Jeffries, the fact that the WPIC writers subsequently did not modify the instruction made jury instruction number 13 erroneous.[362] The State contends the trial court did not err in giving that instruction because Appellant cites no authority for the proposition that WPIC language takes precedence over a decision of this Court.[363] The State also asserts Appellant did not preserve the issue for appeal.[364]
An error may be raised for the first time on appeal if it is a manifest error affecting a constitutional right.[365] An error is "manifest" if it had "practical and identifiable consequences in the trial of the case."[366] The proposition is well-settled that an alleged instructional error in a jury instruction is of sufficient constitutional magnitude to be raised for the first time on appeal.[367] The State cites no contrary authority. In addition, the record demonstrates Appellant did object to jury instruction number 13.[368]
Appellant's argument is without merit, though, because there is no authority for the proposition that WPIC language takes precedence over a decision of this Court. This Court has found language in certain pattern instructions to be deficient.[369] Appellant's argument merely reiterates the "means within a means" argument rejected by this Court in Personal Restraint Petition of Jeffries:[370]
Petitioner appears to take the position that the jury was required to unanimously agree as to alternative ways to satisfy each of the alternative aggravating circumstances. His "means within a means" argument raises the spectre of a myriad of instructions and verdict forms whenever a criminal statute contains several instances of the use of the word "or". For example, the petitioner would now seem to want separate instructions and verdicts on (1) whether the murder was committed to conceal the commission of a crime; (2) whether the murder was committed to protect the identity of any person committing a crime; (3) whether the murder was committed to conceal the identity of any person committing a crime, etc. Petitioner cites no authority for his position and we *1017 perceive no necessity for it. Further, petitioner did not except to the instructions given on the grounds now argued, as required in order to preserve any claimed error, nor did he propose instructions on his theory.[[371]]
In State v. Lord,[372] this Court held that a jury instruction similar to jury instruction number 13 was incomplete because it and the special verdict form allowed the jury to find that either rape or kidnapping was the underlying crime.[373] However, the Court concluded that the special verdict form, when read with the "to convict" instruction for the alternative of first degree murder, cured any problem because that instruction informed the jury its verdict had to be unanimous on which of the alternatives was committed by the defendant: premeditated murder, first degree murder (felony-rape) or first degree murder (felony-kidnapping).[374]
There is no merit to Appellant's argument there was not sufficient evidence to support the various crimes against him listed in jury instruction number 13.[375] He incorrectly suggests the State was required to prove that he committed the crimes of first and/or second degree burglary, first and/or second degree robbery, and first and/or second degree rape.[376] The aggravating circumstance of "in the course of and in furtherance" of a particular crime need not include proof of the completed crime.[377]
In this case, the jury was properly instructed concerning the elements of the crimes of first and second degree robbery, first and second degree rape, and first and second degree burglary.[378] The other instructions, read together with instruction number 13, properly informed the jury of the elements the State was required to prove beyond a reasonable doubt.
In ruling on a challenge to the sufficiency of the evidence, the Court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.[379] The State argued there was substantial evidence that Appellant murdered Ms. Couch "in the course of and in furtherance" of the enumerated crimes. Prior to embarking upon the crimes, Appellant announced his intention to go and "rob" somebody.[380] Co-defendant Wilson and Appellant then went to the Couch residence, gaining entry by force.[381] Various items were taken from Ms. Couch, including the wedding ring she wore, cigarettes, alcoholic and non-alcoholic beverages, and assorted groceries.[382] The laceration to the victim's vagina established proof of rape.[383] Under all the evidence in this case, the State proved beyond a reasonable doubt that Appellant murdered Ms. Couch in the course of, in furtherance of, or in immediate flight from a first or second degree robbery, first or second degree rape, and first or second degree burglary.[384] The court's instruction number 13 and the evidence were sufficient to support the jury's conviction of Appellant Davis in this case.
*1018 Appellant argues the trial court erred in not properly instructing the jury in the "to convict" instruction for first degree felony murder in jury instruction number 20. The State contends the trial court did not err in giving that instruction. The State also asserts that because Appellant was convicted of the greater crime of aggravated first degree premeditated murder, this Court should decline to review Appellant's challenge to the "to convict" instruction.[385]
Appellant has not established he was in any way prejudiced by the trial court's instruction number 20, the "to convict" instruction for first degree felony murder.[386]
In this case, the jury was instructed that if it convicted Appellant of aggravated (premeditated) first degree murder, it would then consider whether the State had proved the aggravating factors beyond a reasonable doubt.[387] The jury obviously followed this instruction and reached a guilty verdict on the substantive charge, as well as on the aggravating factors. Appellant was convicted of the most serious crime of aggravated first degree murder. He has no logical basis for objecting to the content of jury instruction number 20.[388]

PROSECUTORIAL MISCONDUCT
(9) Whether, under the Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 14 and 22 of the Washington Constitution, Appellant was denied a fair trial because of prosecutorial misconduct in statements by prosecuting attorneys during the penalty phase of the trial.

Appellant alleges misconduct by the prosecuting attorneys in their closing argument during the penalty phase. He makes the following statement giving examples of comments he claims were improper:
[A] plea to the jury that the elected prosecutor had prescreened the case for the death penalty, that the defendant had acted as the judge, jury and executioner (of the victim), that he showed no mercy and should have none; gave his personal account of the history of vengeance in society, that the `seeds of anarchy' would be sown' and the `social contract' broken without a willingness to meet [sic] out `the ultimate penalty.' That "a failure to impose the death penalty in a case like this cheapens all our lives."; that the jury should put their compassion where it belongs, with the victim, and to enforce the greater principle "their right as citizens to believe that the death penalty is still the law of the land."[[389]]
(Citations to Report of Proceedings omitted.)
The State maintains the allegedly improper remarks identified by Appellant "illustrate the principle that error can be found in virtually *1019 any statement taken out of context."[390] The State further asserts because Appellant did not object to the comments he now characterizes as misconduct, or ask for a curative instruction or move for mistrial, the alleged misconduct does not meet "Gentry's flagrant, intentional, and incurable test."[391]
The record confirms the State's observation that Appellant's counsel made no objection, requested no curative instruction, and made no motion for mistrial in response to the prosecuting attorneys' closing argument at sentencing.[392] The State is also correct in identifying State v. Gentry as good authority where prosecutorial misconduct is claimed under these circumstances:
"Where improper argument is charged, the defense bears the burden of establishing the impropriety of the prosecuting attorney's comments as well as their prejudicial effect. Reversal is not required if the error could have been obviated by a curative instruction which the defense did not request. The failure to object to a prosecuting attorney's improper remark constitutes a waiver of such error unless the remark is deemed to be so flagrant and ill intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury."[[393]]
Allegedly improper comments by prosecuting attorneys must be reviewed in the context of the total argument, the issues in the case, and the instructions to the jury.[394] In this case, examination of the prosecuting attorneys' comments, in the context of the argument as a whole, leads us to conclude that the actual impact of each allegedly improper statement is minimal.
The prosecuting attorneys did not suggest they had "pre-screened" the case for death penalty qualification.[395] The State's comments were made during a general discussion of when the death penalty should be applied and the comments were not improper. Other remarks sought to establish a "historical context" for the jury's decision on whether to impose the death penalty and were not improper.[396] The mere use of the phrase "the ultimate penalty" in relation to the death penalty is not improper.[397] In the totality of the prosecuting attorney's *1020 remarks, there is no support for a conclusion they were improper.[398]
The prosecuting attorney's comment that Appellant acted as the "judge, jury and executioner of the victim" did not constitute prosecutorial misconduct.[399] There is nothing in the argument to indicate the comment was intended to inflame the jury.[400] Similarly, the State's argument that Appellant should not be shown mercy was in the context of "mercy" as a mitigating factor. It did not inflame the jury.[401]
Arguments by the State asking the jury to act as "a conscience of the community" are not improper unless intended to inflame the jury.[402] The plea from the State that the jurors place their compassion with the victim and enforce the greater principle that it is "their right citizens to believe that the death penalty is still the law of the land" were within permissible bounds and not prejudicial when considered in the context of the State's plea to the jury to act as a conscience of the community.[403]
The prosecuting attorneys at the outset of their closing argument reminded the jurors of the court's instruction "to consider anew the evidence presented during the trial,"[404] and suggested the jurors' decision must be based on all the evidencethe "State's primary evidence" and the "mitigating evidence" presented by Appellant.[405] The prosecuting attorneys' remarks were not improper and did not constitute prejudicial prosecutorial misconduct under Gentry.

STATUTORY REVIEW
(10) Whether, under the Fourteenth Amendment to the United States Constitution, Appellant's sentence of death was the result of prejudice which denied him a meaningful proportionality review mandated by RCW 10.95.130.

Under our capital punishment statute, RCW 10.95, this Court must review a death sentence imposed by a trial court to determine (a) whether there was sufficient evidence to justify the finding by the jury that there were not sufficient mitigating circumstances to merit leniency; (b) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; (c) whether the sentence of death was brought about by passion or prejudice; and (d) whether the defendant was mentally retarded.[406] This review is in addition to the basic review on appeal.[407]
*1021 In this case, Appellant does not claim his death sentence was the result of insufficient evidence to justify an affirmative finding by the jury that there were not sufficient mitigating factors to merit leniency. Nor does Appellant claim the death sentence is disproportionate to the penalty imposed in similar cases or that he is mentally retarded under RCW 10.95.030(2). At any rate, there is no evidence in the record to support such conclusions.
Appellant does claim, however, that his death sentence was the result of passion or prejudice. He attributes the "risk of prejudice" which allegedly deprived him of "any meaningful proportionality review"[408] to the trial court's decision not to sua sponte question prospective jurors during voir dire on the possibility of racial prejudice and instruct the jurors to exclude race as a factor in their deliberations. We have already determined in this opinion that the trial court in this case had no obligation to sua sponte question prospective jurors on racial bias and prejudice.

SUFFICIENCY OF EVIDENCE
In the penalty phase, the jury in this case concluded the State had proved beyond a reasonable doubt that there were not sufficient mitigating circumstances to merit leniency for Appellant Davis.[409] The test for deciding whether there is sufficient evidence to support that conclusion is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify that conclusion beyond a reasonable doubt.[410]
In the penalty phase of his trial, Appellant offered mitigating evidence for the jury to consider in determining whether he merited leniency. He presented the testimony of family members who stated that they still loved him in spite of his murder conviction.[411] There was testimony that when Appellant was growing up his biological father was not a part of his life, but two surrogate father figures were present for periods of several years during his childhood.[412] Appellant left high school in the eleventh grade and was in special education for most of those years, but received his GED (General Educational Development diploma) when he was in the military.[413] Testimony was offered that when Appellant was growing up, he would argue with his six siblings, schoolmates and other neighborhood children in part because of his perception of himself and their perception of his being "slower" in his mental capabilities than they were.[414] His inability to articulate contributed to his receiving a greater amount of corporal punishment at home, at the hands of an allegedly abusive surrogate father figure, and his exclusion from group activities by other children.[415] Appellant also offered testimony from a representative of the Pierce County Jail, as an example of his tendency to do well in incarceration, that he had not incurred any major infractions while in custody since early 1997.[416] The main focus of Appellant's mitigating evidence was given in testimony by two experts, Dr. Lloyd I. Cripe, Ph.D., and Dr. Robert B. Olsen, M.D.
Dr. Lloyd I. Cripe, Ph.D., specializing in clinical neuropsychology, performed intelligence tests and neuropsychological tests on Appellant on two occasions.[417] On the first *1022 occasion, in September 1994, Appellant's IQ was measured at 82, while the second more comprehensive testing conducted in May 1997 measured his IQ at 81, which placed him in the "dull-normal" lower end range of intelligence.[418] After performing other tests, Dr. Cripe diagnosed Appellant as suffering from a learning disability[419] and impaired neuropsychological functioning from 1994 through 1997,[420] based upon a history of difficulty in regulating his behavior, his abuse of alcohol and other drugs, his diabetic condition, and a review of his medical records during his military service.[421]
On October 17, 1997, Dr. Robert B. Olsen, M.D., a specialist in internal medicine and psychiatry, examined Appellant and administered psychological tests to him.[422] Dr. Olsen, like Dr. Cripe, referred to Appellant's history of diabetes, chronic alcohol and cocaine abuse and a progressive decline of complex mental functioning between 1994 and 1997.[423] Dr. Olsen was of the opinion that Appellant suffered from certain anti-social, borderline and schizotypal personality disorders,[424] but because his brain scan (MRI) and brain wave (EEG) tests were normal, Appellant does not have altered structure in his brain.[425]
Viewing all the evidence in a light most favorable to the prosecution, a rational trier of fact could find sufficient evidence to support the jury's conclusion that Appellant Davis did not merit leniency.[426] The jury apparently discounted evidence of Appellant's difficult childhood as a mitigating factor. Appellant robbed, raped, burglarized, and murdered sixty-five-year-old Yoshiko
Couch in her own home while her husband was present in the home. Her husband was severely disabled and unable to come to her assistance even if he had been aware of the event. In his report, the trial judge commented on the appropriateness of Appellant's sentence by referring to this "extraordinarily violent, vicious and cruel murder" by a defendant (Appellant) who is "without remorse."[427] Considering the nature of the crime, a rational jury could conclude that Appellant's personal history did not constitute sufficient mitigation to convince the jury he deserved leniency.
The State offered the testimony of two of the Couches' four adult children, all of whom are married and have children, concerning the impact their mother's death had on them and other members of the family, including the Couches' five grandchildren. Allen R. Couch, the youngest child of Yoshiko and Richard Couch, testified about how the death of his mother has resulted in his difficulty sleeping and being a bit short tempered,[428] while his two older brothers are similarly upset, sad, more paranoid now and introverted about their feelings.[429] He also explained that the impact of his mother's death on her grandchildren varied; two grandchildren are very young, an infant and an eight month old, while the other three grandchildren, ages eight, ten and eleven, took the news hard, with one grandchild refusing to be left alone.[430]
The Couches' only daughter, Ms. Diana Rodriguez, testified concerning how her father missed her mother after her death, how he talked about her every day, and that he *1023 lost the will to do anything because he wanted to be with her.[431] Richard Couch died on October 12, 1997, approximately nine months after his wife's death.[432] The impact of her mother's death led her to seek counseling, and she has had recurring thoughts about her own mortality and her inability to feel secure in her own home.[433] Both Allen R. Couch and his sister recalled their mother's devotion to the family and her caring nature.[434]
"The mere presence of mitigating circumstances does not require reversal if the jury is convinced the circumstances of the crime outweigh the proposed mitigating factors."[435] The jury in this case could reasonably have determined that none of the mitigating factors presented by Appellant were sufficiently persuasive against the aggravating circumstances of Appellant's brutal treatment of Ms. Yoshiko Couch. Under these circumstances, there was sufficient evidence in the record to support the jury's finding that leniency was not merited under RCW 10.95.130(2)(a).

PROPORTIONALITY
Under RCW 10.95.130(2)(b), this Court is required to conduct a proportionality review in every capital case to determine
Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120[.]
RCW 10.95.120 requires filing of reports by trial judges "[i]n all cases in which a person is convicted of aggravated first degree murder." This pool of cases includes those in which the death penalty was sought and those in which it was not.[436]
The purpose of conducting proportionality review is to avoid two systemic problems associated with imposition of capital punishment: random arbitrariness and imposition in a racially discriminatory manner.[437] The focus in this case is on racial discrimination, since there is no claim of random arbitrariness.
This Court, in attempting to achieve this purpose, considers both "the crime and the defendant" in comparison with other "similar cases" in determining whether the sentence of death was imposed "generally in similar cases, and not imposed wantonly and freakishly."[438] After a series of decisions,[439] this Court has recognized in considering proportionality that "mathematical precision is unworkable and unnecessary."[440]
The test established by this Court in analyzing "the crime and the defendant" in relation to "similar cases" requires examination of four factors including (1) the nature of the crime, (2) the aggravating circumstances, (3) the defendant's criminal *1024 history and (4) the defendant's personal history.[441] Under RCW 10.95, proportionality review does not require that there be no variance from case to case, nor that a sentence of death be uniformly imposed in all superficially similar circumstances.[442] "Precise uniformity is not possible because `the brutal and extreme [crimes] with which we deal in death penalty cases, are unique and cannot be matched up like so many points on a graph.' Instead, the court looks for `overlapping similarities' and common resemblances between cases."[443]

Nature of the Crime
The nature of the crime committed by Appellant Davis was particularly brutal. At approximately 2:30 a.m., in the presence of Co-defendant Wilson and Keith D. Burks, Appellant announced his desire "to rob somebody" and "to kill me a motherfucker."[444] Minutes later, Appellant acted upon his desire to rob and to kill and chose as his victims his elderly neighbors who lived across the street from him. Their potential for resistance, if any, was slight. According to the statements made by Co-defendant Wilson to Mr. Burks, the intent of Appellant and Mr. Wilson to rob or burglarize the Couch residence was overshadowed by Appellant's bold and vicious acts of kicking open the front door, facing Ms. Couch, and beating her and rubbing her breasts.
The record, including the physical evidence in the case, indicates a large amount of biological tissue (blood clot) found on a sleeping bag recovered from the bed in the southeast bedroom. The medical examiner concluded Ms. Couch was raped by an object, not a penis, resulting in a vaginal laceration causing a large blood flow. The rape occurred before her death.
According to the medical examiner, Ms. Couch was taken at some undetermined time to the bathroom, and while lying on her back in the bathtub, was asphyxiated by suffocation, neck compression, and poisoned by the toxin xylene with towels saturated with the chemical piled on her head and upper torso. The chemical xylene is known to cause death by inhalation within minutes. She was left to die in her bathtub while Appellant robbed and burglarized her home. He attempted to conceal his identity by destroying physical evidence with the use of Comet cleanser, a sponge and a scouring pad. In addition, these acts occurred while Richard Couch, her severely disabled husband, was in his bedroom downstairs and his bedside telephone was placed in a closet out of his reach.
Comparing Ms. Couch's suffering to that endured by victims in other "similar cases" considered by this Court indicates that Appellant Davis' crime is at least as brutal as those committed in other cases in which this Court upheld imposition of the death penalty after proportionality review.[445] "A brutal murder involving substantial conscious suffering of the victim makes the murderer more deserving of the death penalty."[446]

*1025 Aggravating Circumstances

The jury found Appellant "guilty" of aggravated first degree murder, specifying three aggravating factors.[447] It found he committed the murder of Ms. Couch in the course of, in furtherance of, or in immediate flight from (1) a robbery in the first or second degree, (2) a rape in the first or second degree, or (3) a burglary in the first or second degree. Only one aggravating factor is needed for imposition of the death penalty absent a finding the defendant is mentally retarded.[448] There is no evidence Appellant is retarded. In 1997, he tested in the dull normal range with an IQ of 81.
In this case, the death sentence is not excessive or disproportionate in comparison with other cases in which the death penalty was imposed.[449] The aggravating circumstances found by the jury in this case sufficiently support our conclusion that Appellant's sentence of death is not disproportionate when compared to other cases in which the death penalty was imposed.

Criminal History
Appellant's death sentence is not disproportionate when his criminal history is considered. His record includes prior convictions for (1) robbery in the second degree in 1986, (2) perjury in the second degree in 1986, (3) assault in the fourth degree in 1988, (4) assault in the second degree in 1990, (5) criminal trespass in the first degree in 1990, (6) driving without a valid operator's license in 1992, (7) driving without a valid operator's license in 1993, (8) theft in the third degree in 1992, and (9) violation of a domestic violence pretrial no-contact order in 1995.[450] His record shows a history of violence towards others. His criminal history is comparatively more extensive than that of other appellants who received the death penalty.[451]

Personal History
The subjective factors in Appellant's personal history are not sufficient to override the circumstances and consequences of his crime. "`The role of mitigation evidence is to reduce culpability for a crime that has already been proved.'"[452] Appellant's mitigation evidence ranged from testimony about his difficult childhood to medical testimony concerning his diagnosed personality disorders. Although commonly asserted, a history of abuse as a child seldom affects the outcome of aggravated first degree murder cases.[453] Also, this Court has upheld death sentences imposed on appellants with medically diagnosed personality disorders similar to, or more severe than, Appellant's.[454]
*1026 Appellant's death sentence is not disproportionate to sentences imposed in similar cases. The factors employed by this Court in considering both the "crime and the defendant" justify the conclusion that Appellant Davis' case is sufficiently similar to other cases in which the death penalty has been imposed and upheld on appeal. The nature of his crime is as brutal and heinous as any considered by this Court. His criminal history is extensive and shows a pattern of violence towards others. The jury found numerous aggravating factors in convicting him of aggravated first degree murder. His mitigating evidence was doubtless not sufficient to convince the jury that he merited leniency, the consequence being that he would be sentenced to death. Under these circumstances, this Court concludes the death sentence imposed upon Appellant Davis was not disproportionate to the crime committed and that it was not wantonly or freakishly imposed.

PASSION OR PREJUDICE
Appellant asserts that his death sentence was brought about through passion or prejudice. He attributes the "risk of prejudice" which he claims deprived him of "any meaningful proportionality review"[455] to the trial court's decision not to sua sponte question prospective jurors during voir dire on the possibility of racial prejudice and instruct the jurors to exclude race as a factor in their deliberations.
Turner v. Murray and a review of the record in this case support a conclusion that a trial court in a capital case need not question jurors sua sponte during voir dire on possible racial prejudice nor instruct jurors to disregard racial considerations in the absence of a request by a party. Appellant made no such request. There is absolutely no evidence in the record in this case to support a conclusion that the verdict of the jury was based upon passion and prejudice.

MENTAL RETARDATION
RCW 10.95.030(2) proscribes imposition of capital punishment upon persons who were mentally retarded at the time they committed the crimes for which they are being sentenced. To be considered "mentally retarded" under the statute a person must have, among other things, "significantly subaverage general intellectual functioning," which is defined as having an IQ of 70 or below.[456] Appellant does not claim he is mentally retarded. To the contrary, the record shows he had a measured IQ of 82 in 1994 and 81 in 1997.[457] There is no evidence to support a claim of mental retardation even if the claim were made.
After a review of the errors claimed by Appellant Davis and a mandatory statutory review, we conclude there is no reversible error in the guilt phase and no reversible error in the penalty phase of Appellant's trial. Under the facts of this case, Appellant's conviction for aggravated murder in the first degree, the jury's determination he did not merit leniency, and the consequent imposition of the sentence of death should be affirmed.

SUMMARY AND CONCLUSIONS
(1) The trial court did not abuse its discretion in not sua sponte questioning prospective jurors concerning racial bias during voir dire examination under the Sixth or Fourteenth Amendments to the United States Constitution and article I, sections 3 and 22 of the Washington Constitution. Nor did the trial court abuse its discretion in not sua sponte instructing the jury to exclude consideration of race as a factor in the case.
*1027 (2) The trial court did not abuse its discretion in admitting the testimony of prosecution witness Keith D. Burks. His testimony was admissible under the excited utterance exception to the hearsay rule, a "firmly rooted" exception, and therefore did not violate Appellant's right of confrontation under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. The trial court did not abuse its discretion in allowing prosecuting attorneys to ask Mr. Burks on redirect examination, "With the people that you hang out with, is it a good thing or a bad thing to be labeled a snitch?"
(3) Appellant did not establish that the trial court erred in admitting the testimony of prosecution witness Asil Hubley in violation of the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 3 and 22 of the Washington Constitution. Even assuming it was error for the trial court to allow leading questions by the prosecutor to this witness, there was no sufficient objection and the error was harmless.
(4) The trial court did not abuse its discretion in admitting a videotape of the crime scene. The videotape aided the jury's understanding of the scene and was not prejudicial to Appellant.
(5) The trial court did not abuse its discretion in refusing to admit unauthenticated Washington State population statistics. The hard copy printout from the Internet containing population statistics does not qualify under the public records exception to the hearsay rule and RCW 5.44.040. Nor does it qualify as a self-authenticating document under ER 902.
(6) The trial court properly denied Appellant's challenge to juror number 6 for cause during voir dire. The answers of juror number 6 would not have affected his ability to follow the court's instructions and abide by his oath as a juror. The trial court properly excused jurors number 50 and 38 for cause during voir dire. Their answers indicated they would not have been able to follow the court's instructions and abide by their oaths as jurors.
(7) The trial court had no obligation to inquire into a potential conflict of interest arising out of possible prior representation of the State's witness, a "jailhouse informer," by the public defense agency, Department of Assigned Counsel, from which defense counsel were assigned where there was no evidence whatever of an actual or possible conflict of interest adversely affecting the performance of Appellant's counsel.
(8) Jury instruction number 13 properly instructed the jury on aggravating circumstances. Appellant's claim that there was not sufficient evidence to support the various crimes listed in jury instruction 13 is without merit. Appellant was not in any manner prejudiced by jury instruction number 20, the "to convict" instruction for first degree felony murder. The jury convicted Appellant of the most serious crime of aggravated first degree murder.
(9) None of the statements made by the prosecuting attorneys during the penalty phase of the trial constituted prosecutorial misconduct denying Appellant a fair trial under the Eighth and Fourteenth Amendments to the United States Constitution or article I, sections 14 and 22 of the Washington Constitution.
(10) Appellant's sentence of death was not the result of passion or prejudice in violation of the Fourteenth Amendment to the United States Constitution. Under the proportionality review mandated by RCW 10.95.130, we conclude the sentence of death was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the Appellant. There was sufficient evidence to justify the finding by the jury that there were not sufficient mitigating circumstances to merit leniency. There is no evidence that Appellant is mentally retarded as defined under RCW 10.95.030(2).
We affirm the conviction of Appellant Cecil Emile Davis in the Pierce County Superior Court for the aggravated first degree murder of Ms. Yoshiko Couch and affirm the sentence of death imposed after the jury determined there were not sufficient mitigating circumstances to merit leniency.
*1028 GUY, C.J., JOHNSON, MADSEN, ALEXANDER, TALMADGE, IRELAND, and BRIDGE, JJ., concur.
SANDERS, J. (dissenting).
I dissent for two reasons. First, as I read the record, the trial court erred in admitting the hearsay statement of George Anthony Wilson against Cecil Davis under the "excited utterance" exception to hearsay. Second, jury instruction 13, defining aggravators to first degree murder, incorrectly allowed the jury to convict Davis of aggravated first degree murder absent unanimity as to what aggravating factor Davis committed. Because these two errors go to the heart of Davis's conviction, I would reverse both his conviction and death sentence and remand for a new trial.

I. HEARSAY
Davis claims the testimony of prosecution witness Keith Burks, in which Burks related statements made by codefendant George Wilson, are hearsay and should not have been admitted at trial under the "excited utterance" exception, ER 803(a)(2). In my view the majority errs both in its standard of review as well as its application of the law to the facts.
A. Standard of Review
The majority claims, "A determination by the trial court that a hearsay statement falls within the excited utterance exception under ER 803(a)(2) will not be disturbed on appeal absent an abuse of discretion." Majority at 1003 (citing State v. Strauss, 119 Wash.2d 401, 417, 832 P.2d 78 (1992)). Developments since Strauss have made it less clear whether the standard of review for excited utterances is de novo or abuse of discretion.
In State v. Brown, 127 Wash.2d 749, 758, 903 P.2d 459 (1995), we noted:
While we are sympathetic to the Court of Appeals' desire to defer to the trial court's evaluation of the complaining witness' credibility and hence ultimately of the tape's reliability, this approach has no place in the excited utterance rule. The excited utterance exception is based on the idea that:
`under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control.' The utterance of a person in such a state is believed to be `a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock,' rather than an expression based on reflection or self-interest.
Id. (quoting State v. Chapin, 118 Wash.2d 681, 686, 826 P.2d 194 (1992) (quoting 6 John Henry Wigmore, Evidence § 1747, at 195 (James H. Chadbourn rev.1976))).
Taking its cue from Brown, Division Three of the Court of Appeals explicitly found the standard of review of an excited utterance was de novo. In State v. Sharp, 80 Wash. App. 457, 909 P.2d 1333 (1996), the Court of Appeals reasoned, "The events surrounding the utterance here occurred two months before the trial. The trial court, accordingly, is in no better position than we are to evaluate the circumstances surrounding [the declarant's] utterance." Id. at 461, 909 P.2d 1333.
Division Three has recently retreated from Sharp, stating "[t]he standard of review is again abuse of discretion. Unfortunately, application of this standard to the excited utterance exception has become a bit clouded by two recent decisions, one by the Supreme Court, State v. Brown, and one from this Division, State v. Sharp." State v. Williamson, 100 Wash.App. 248, 255-56, 996 P.2d 1097 (2000) (footnotes omitted). However Division Three's retreat from Sharp is inexplicable strictly speaking the court did not persuasively explain its retreatin light of the undeniable truth of its statement in Sharp that, "The trial court ... is in no better position than we are to evaluate the circumstances surrounding [an excited] utterance." Sharp, 80 Wash.App. at 461, 909 P.2d 1333. That statement is more consistent with our approach to standard of review in Brown than the more deferential standard the majority gives to the trial court's determination. I would review the record de novo. Moreover, I do not believe Burks's relation of Wilson's statement qualifies as an *1029 "excited utterance" under even a lesser standard.
B. The Purported Excited Utterance
At issue is the following testimony from prosecution witness Burks, who was told the following by codefendant Wilson approximately five or six minutes after Davis began to perpetrate the crime: "[Davis] went over there to rip the lady off, but [he] just kicked in the door and started beating on her and rubbing [her] all over." Report of Proceedings (RP) (1/27/98) at 1508-09. Furthermore Wilson told Burks the victim was coming down the stairs, and that Davis rubbed her breasts. He identified the victim to Burks as "the old woman across the street," RP at 1508, and told Burks that as soon as he realized what Davis was doing to the woman he left the Couch residence. These statements formed the centerpiece of the state's case against Davis because they provided an eyewitness account of him inside the Couch residence attacking the victim.
The defense moved to exclude these statements as hearsay, but the trial court allowed them as excited utterance exceptions to hearsay. The three elements of the excited utterance exception are (1) a startling event or condition, (2) the declarant is under the stress of the startling event or condition, and (3) the declaration is related to the startling event or condition. ER 803(a)(2); Chapin, 118 Wash.2d at 686, 826 P.2d 194. Spontaneity is crucial to the determination. Williamson, 100 Wash.App. at 258, 996 P.2d 1097. The passage of time between event and utterance is relevant but not dispositive. Strauss, 119 Wash.2d at 416-17, 832 P.2d 78. Other considerations include the declarant's emotional state and whether the declarant had an opportunity to reflect on the event and fabricate a story. State v. Briscoeray, 95 Wash.App. 167, 173-74, 974 P.2d 912, review denied, 139 Wash.2d 1011, 994 P.2d 848 (1999). "[T]he `key determination is "whether the statement was made while the declarant was still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment."'" Brown, 127 Wash.2d at 759, 903 P.2d 459 (second alteration in original) (quoting Strauss, 119 Wash.2d at 416, 832 P.2d 78 (quoting Johnston v. Ohls, 76 Wash.2d 398, 406, 457 P.2d 194 (1969))).
In this case, five to six minutes passed between Wilson's witness of Davis's alleged attack on the victim and speaking to Burks about it. It apparently took Wilson five to six minutes to cross the street, as we know the house Burks occupied was across the street from the Couch home. Five minutes' time is ample and sufficient time to reflect and develop a self-serving story. See 5B Karl B. Tegland, Washington Practice: Evidence Law and Practice § 803.6, at 419-20 (4th ed. 1999) ("Although the statement need not be contemporaneous with the startling event, a number of decisions have excluded statements offered as excited utterances on the basis that the passage of time allowed the declarant to reflect." (footnote omitted)).
In fact later events further demonstrate Wilson's self-serving story was unreliable. Two days after speaking to Burks, Wilson spoke with another prosecution witness, Davis's 16-year-old nephew Asil Hubley. Wilson told Hubley three different versions of his involvement in the crime. First Wilson told Hubley he had been inside the upstairs bathroom of the Couch residence (where the victim's body was found). After that Wilson changed his story to say he stayed on the couch in the Couch home and heard noises coming from the bedroom upstairs. Thereafter Wilson changed his story still again to say he did not go into the Couch home at all. Wilson's latest admission is inconsistent with his putative excited utterance that Davis entered the home and began to assault the victim. Wilson thus fabricated at some point in the development of his story, which casts further doubt on the reliability of his original, self-serving, utterance. While "[t]he fact that a statement is self-serving does not make the statement inadmissible," nevertheless "the self-serving nature of a statement may be an important factor in judging spontaneity in particular instances." 5B Tegland, supra, § 803.6, at 423-24 (footnote omitted). Looking at the length of time between Wilson's going from the victim's home to *1030 Burks's house, the fact his story is inconsistent with later statements, and the fact it was self-serving demonstrate the statements lacked the suddenness, spontaneity, and other indicia of reliability necessary to justify admission of hearsay as exceptions to the rule. The majority's conclusory assertions to the contrary ("The opportunity for [Wilson] to reflect on the statement was minimal and the evidence supports a conclusion he was under stress when he spoke to Mr. Burks."; "[T]he time between the event and the statement was sufficiently slight to ensure that when he made the statement to Mr. Burks, Mr. Wilson was still under the stress of witnessing Appellant's attack upon Ms. Couch." Majority at 1004-1005) are conclusions not in tune with the facts.
C. Constitutional Right to Confront Accusing Witness
Davis claims the trial court's decision to admit Wilson's hearsay statements violated his right under the Sixth Amendment to the United States Constitution to confront accusing witnesses. At the heart of the Sixth Amendment's confrontation clause is the reliability of evidence against an accused at trial. Lilly v. Virginia, 527 U.S. 116, 123-24, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) ("`The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.'" (quoting Maryland v. Craig, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990))). A hearsay statement must be reliable in order for its admission not to violate the confrontation clause. Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).
Of course, hearsay statements are by definition unreliable, and hearsay statements from accomplices (we must recall Wilson was a codefendant of Davis) which implicate a criminal defendant are "inherently unreliable." Lilly, 527 U.S. at 131, 119 S.Ct. 1887. Nevertheless the Supreme Court has applied the "adequate `indicia of reliability'" requirement, stating that reliability can be inferred when a hearsay statement (1) "falls within a firmly rooted hearsay exception" or (2) contains "particularized guarantees of trustworthiness." Roberts, 448 U.S. at 66, 100 S.Ct. 2531.
The majority claims, "The Supreme Court has stated that the excited utterance exception to the hearsay rule is a `firmly rooted hearsay exception' that carries sufficient indicia of reliability to satisfy the reliability requirements of the confrontation clause." Majority at 1005 (citing White v. Illinois, 502 U.S. 346, 356 n. 8, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992)). In fact, the Court in White v. Illinois says nothing of the sort. However in all fairness, in Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), the Court implied the "excited utterance" exception is "firmly rooted":
[T]he statement [at issue] was not made under circumstances of reliability comparable to those required, for example, for the admission of excited utterances or statements made for purposes of medical diagnosis or treatment. Given the presumption of inadmissibility accorded accusatory hearsay statements not admitted pursuant to a firmly rooted hearsay exception ... we agree with the court below that the State has failed to show ... incriminating statements ... possessed sufficient "particularized guarantees of trustworthiness" under the Confrontation Clause to overcome that presumption.
Id. at 827, 110 S.Ct. 3139 (citation omitted). So assuming arguendo the "excited utterance" exception is firmly rooted, it apparently falls within the Roberts rule.
Notwithstanding the reasoning necessary to achieve the majority's conclusion is circular: "In this case, Co-defendant Wilson's statement to Mr. Burks is reliable because it falls within a `firmly rooted' hearsay exception, the excited utterance exception under ER 803(a)(2), and does not offend Appellant's rights under the confrontation clause." Majority at 1005. As noted above, the excited utterance exception to hearsay is based solely upon the presumption that statements made while the declarant is under the stress of a startling event (and thus unable to reflect, fabricate, etc.) are reliable. Strauss, 119 Wash.2d at 415-16, 832 P.2d 78 (emphasis added). For confrontation clause *1031 purposes, a hearsay statement is presumed reliable if it falls under a firmly rooted exception. Yet it falls under the exception in the first place only if it is presumed reliable. This bizarre chain of reasoning makes no sense.
Even if it did make sense, my conclusion would be no different because I do not believe Wilson's statement to Burks constituted an excited utterance. Therefore I agree with Davis that the trial court erred in admitting the statements and that their admission violated his Sixth Amendment rights.

II. JURY INSTRUCTION 13
Jury instruction 13 is inconsistent with State v. Brett, 126 Wash.2d 136, 892 P.2d 29 (1995) and State v. Lord, 117 Wash.2d 829, 878, 822 P.2d 177 (1991) because it does not require unanimity as to a particular aggravating circumstance. It is particularly troubling in this capital context that the majority is willing to obviate numerous well-settled maxims of state and federal constitutional law in order to affirm a jury instruction which allows a nonunanimous conviction of our state's most serious crime and sentence. I need not rehash, but will set forth for the record, my agreement with the searching criticism of nonunanimous aggravating circumstances instructions Justice Utter set forth in In re Personal Restraint of Jeffries, 110 Wash.2d 326, 349-55, 752 P.2d 1338 (1988) (Utter, J., dissenting). Developments in the case law since In re Personal Restraint of Jeffries confirm Justice Utter's criticism.
In this case, jury instruction 13 reads:
If you find defendant Cecil Davis guilty of Premeditated Murder in the First Degree as defined in Instruction 9, you must then determine whether the following aggravating circumstance exists:
The murder was committed in the course of, in furtherance of, or in immediate flight from a Robbery in the First or Second Degree, a Rape in the First or Second Degree, or a Burglary in the First or Second Degree.
The State has the burden of proving the existence of an aggravating circumstance beyond a reasonable doubt. In order for you to find that there is an aggravating circumstance in this case, you must unanimously agree that the aggravating circumstance has been proved beyond a reasonable doubt. You need not be unanimous as to any one of the crimes listed within the aggravating circumstance.
Clerk's Papers (CP) at 859.
In Brett we upheld an instruction on the issue of jury unanimity because it separated out the separate aggravating circumstances in RCW 10.95.020(9) and explicitly required unanimity as to each alternative on which the jury found Brett guilty. Brett, 126 Wash.2d at 174, 892 P.2d 29 ("The second to the last paragraph [of the challenged jury instruction] clearly informs the jury that if a unanimous decision on each element of an alternative cannot be reached then it is not to `fill in the blank for that alternative.'").
In Lord, we found "incomplete" a jury instruction that allowed the jury to find rape or kidnapping was the underlying crime, and the jury was not required to unanimously agree as to which underlying crimerape, or kidnapping, or bothwas committed:
Each of the alternatives set out in both instruction 13 and Special Verdict Form A-1 allowed the jury to find that either rape or kidnapping was the underlying crime. Because neither required the jury to unanimously agree as to which underlying crimerape, or kidnapping, or both was committed, the instruction was incomplete.
Lord, 117 Wash.2d at 878, 822 P.2d 177. The Lord instruction was "incomplete" in the sense it was similar to this instruction which lumped all aggravators together in the second paragraph, with the last sentence of the instruction excusing the jury from reaching a unanimous verdict on which aggravating factor, if any, applies.
Although the majority has apparently let the state draft this portion of its opinion,[1] it *1032 does not disclose that the state concedes individualized interrogatories for each aggravator are at least preferable. Second Corrected Br. of Resp't at 94 ("[T]he State suggests that in future cases the submission of interrogatories on the issue of which crimes the jury found applicable might be preferable."). Unlike the state, I would argue unanimous agreement as to aggravators is required for Davis's conviction to meet the minimum guaranteed standards of due process and trial by jury, U.S. Const. amend. V; Const. art. I, § 21, and to allow a meaningful opportunity to review Davis's death sentence as required by statute, RCW 10.95.100. See also In re Personal Restraint of Jeffries, 110 Wash.2d at 354-55, 752 P.2d 1338 (Utter, J., dissenting) ("[T]he fact that the jury was not required to unanimously agree on the different alternatives within the proposed aggravating circumstances makes meaningful review impossible. We are unable to carry out our statutory mandate to review this sentence of death because we cannot know what aggravating circumstance the jury had in mind when it endeavored to determine if leniency was appropriate." (citing RCW 10.95.020)).
Following the state's lead, the majority claims Davis seeks the "means within a means" approach to jury instructions this court rejected in In re Personal Restraint of Jeffries, 110 Wash.2d at 339-40, 752 P.2d 1338. However here we deal with aggravating circumstances in a significantly different way than was instructed in Jeffries. Jeffries was convicted of aggravated first degree murder where the aggravating circumstances were commission of the murder in order to conceal the commission of the crime or the identity of the defendant and multiple victims in a common scheme or plan. In re Personal Restraint of Jeffries, 110 Wash.2d at 338-39, 752 P.2d 1338; RCW 10.95.020(7), (8). We observed:
The trial court instructed the jury that each element of the crime of aggravated murder in the first degree must be proved beyond a reasonable doubt, and that if either of the aggravating circumstances was proved beyond a reasonable doubt, the jury had a duty to return a verdict of guilty. In the same "to convict" instructions, the trial court also instructed the jury that the aggravating circumstances were alternatives, that only one need be proved, and that the jury must unanimously agree whether either had been proved.
Id. at 339, 752 P.2d 1338. Furthermore the instruction separated out the two aggravating circumstances into two interrogatories rather than lumping them together. Id. The structure of the instructions in In re Personal Restraint of Jeffries was such that the jury "had to unanimously agree as to at least one of the alternative aggravating circumstances charged," id., and do so by separate interrogatory. But the instructions here were significantly different.
Here the state alleged as aggravating factors that Davis committed the murder in the course of, in furtherance of, or in immediate flight from first or second degree robbery, first or second degree rape, or first or second degree burglary. CP at 859 (jury instruction 13); RCW 10.95.020(11)(a)-(c). The instruction commingled three of the disparate aggravating crimes set forth in RCW 10.95.020(11) without requiring the jury to manifest unanimous agreement, by separate interrogatory, as to any aggravating crime Davis committed. Therefore less than a unanimous jury could have believed any particular aggravating crime existedin fact less than even a bare majority of the jury *1033 in order to unanimously find some aggravating crime had been committed.
Such an instruction offends well-settled constitutional principles. It is axiomatic that a criminal defendant can be convicted only on a unanimous verdict. State v. Ortega-Martinez, 124 Wash.2d 702, 707, 881 P.2d 231 (1994) (citing Const. art. I, § 21). An essential aspect of a unanimous jury trial is express juror unanimity on the means by which the defendant is found to have committed the crime. Ortega-Martinez, 124 Wash.2d at 707, 881 P.2d 231; accord State v. Green, 94 Wash.2d 216, 616 P.2d 628 (1980); State v. Whitney, 108 Wash.2d 506, 739 P.2d 1150 (1987); State v. Franco, 96 Wash.2d 816, 639 P.2d 1320 (1982). This instructional error demands reversal even if there was substantial evidence to indicate each of the alternative aggravators had been established; however, the evidence of each is problematic as well.
If alternative means of committing the crime are submitted to the jury, due process demands each alternative means charged must be supported by sufficient evidence. Franco, 96 Wash.2d at 823, 639 P.2d 1320; Green, 94 Wash.2d at 232, 616 P.2d 628. The test for sufficient evidence is whether the evidence would justify a rational trier of fact to find guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This rule follows from the Winship doctrine that due process requires the government prove every element of a crime upon which a defendant is convicted beyond a reasonable doubt. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).
Here, Davis raises serious doubt as to the sufficiency of the evidence supporting either the robbery or rape aggravator. With respect to the robbery, the jury was instructed that a person is guilty of robbery in the first degree if in the commission of a robbery or of immediate flight therefrom, he inflicts bodily injury, RCW 9A.56.200, and is guilty of robbery in the second degree when he commits robbery. RCW 9A.56.210; CP at 863 (jury instruction 17). With respect to rape, for our purposes, a person is guilty of first degree rape when he engages in sexual intercourse with another person by forcible compulsion and inflicts serious physical injury on the victim or feloniously enters the building where the victim is situated, RCW 9A.44.040(1)(c)-(d), and a person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, he engages in sexual intercourse with another person by forcible compulsion. RCW 9A.44.050; CP at 865 (jury instruction 18).
A careful reading of the record in this case casts serious doubt on the sufficiency of the evidence supporting either the robbery or rape aggravators. First, the majority simply does notbecause it cannot on this record link the theft of certain itemscigarettes, food, beer, jewelry, etc., found on the defendant after the crimewith the underlying death of the victim. As Davis persuasively argues, Ms. Couch could have been dead well before an intent formed to steal any items from her home. As the majority frames the record, Ms. Couch was apparently killed sometime shortly after 2:30 a.m. on January 25, 1997, but was not discovered dead until approximately 11:00 a.m. the following day. Majority at 986-987 (citing RP (1/27/98) at 1500-05; RP (1/22/98) at 1260-61). Accordingly there is reasonable doubt any bodily injury was inflicted in the course of or in immediate flight from the robbery. RCW 9A.56.200, .210. Furthermore there is reasonable doubt whether the murder was committed in the course of, in furtherance of, or in immediate flight from the robbery. RCW 10.95.020(11)(a).
Secondly, the most convincing evidence to implicate Davis as the rapist as opposed to his codefendant George Wilson is Wilson's self-serving hearsay statements to Keith Burks admitted at trial over the objection of defense counsel, and discussed above. This is not a record where DNA (deoxyribonucleic acid) evidence links Davis to the rape. Rather it is a record of circumstantial evidence bolstered by a hearsay account which, in my view, should not have been admitted at trial.
Failing sufficient evidence to convict on the alternative means of committing aggravated first degree murder, we are left with the scenario of Green, in which a conviction must be reversed because
*1034 In the instant case, the jury instructions and verdict form did not require the jury to unanimously find appellant committed or attempted to commit either first degree kidnapping or rape or both. As instructed, it was possible for the jury to have convicted Green with six jurors resting their belief of guilt upon kidnapping and the other six resting their belief upon rape. Thus, it is impossible to know whether the jury unanimously decided that the element of rape had been established beyond a reasonable doubt.
Green, 94 Wash.2d at 233, 616 P.2d 628. Likewise here we do not know whether the jury unanimously decided whether the rape, robbery, or burglary with which Davis was charged as an aggravator was established beyond a reasonable doubt.
Based on the jury instructions we reviewed in Brett and Lord, after In re Personal Restraint of Jeffries, we affirmed the necessity of unanimous jury verdicts as to each alternative aggravator, the lack of which renders, in Lord, the aggravating crimes instruction "incomplete." This "incompleteness" is repugnant here because it leaves us in the constitutionally intolerable position of reviewing Davis's death sentence on a conviction of aggravated first degree murder without having the slightest idea what aggravating circumstance, if any at all, the jury unanimously agreed existed.
I dissent.
NOTES
[1] Report of Proceedings (Jan. 23, 1998) at 1313.
[2] Report of Proceedings (Jan. 22, 1998) at 1260-63.
[3] Id.
[4] Report of Proceedings (Jan. 27, 1998) at 1568-69; see Report of Proceedings (Feb. 4, 1998) at 2073.
[5] Report of Proceedings (Jan. 22, 1998) at 1263.
[6] Report of Proceedings (Jan. 23, 1998) at 1298; Report of Proceedings (Feb. 3, 1998) at 1948-49.
[7] Report of Proceedings (Jan. 22, 1998) at 1263; Report of Proceedings (Jan. 23, 1998) at 1292-98; see Report of Proceedings (Jan. 27, 1998) at 1570; Report of Proceedings (Feb. 4, 1998) at 2081.
[8] See Report of Proceedings (Jan. 23, 1998) at 1317; Report of Proceedings (Jan 27, 1998) at 1449-50; Report of Proceedings (Jan. 29, 1998) at 1709; Report of Proceedings, (Feb. 3, 1998) at 1974.
[9] Report of Proceedings (Feb. 2, 1998) at 1784-86.
[10] See Report of Proceedings (Feb. 3, 1998) at 1925.
[11] Report of Proceedings (Jan. 27, 1998) at 1500.
[12] Report of Proceedings (Feb. 2, 1998) at 1899-1900.
[13] Report of Proceedings (Jan. 27, 1998) at 1502-03.
[14] See id. at 1505.
[15] Report of Proceedings (Feb. 2, 1998) at 1889-90.
[16] Report of Proceedings (Jan. 27, 1998) at 1505.
[17] Id. at 1506; Report of Proceedings (Feb. 2, 1998) at 1890-91.
[18] Report of Proceedings (Jan. 27, 1998) at 1507-08.
[19] Id.
[20] Id. at 1508-09.
[21] Id. at 1525.
[22] Id. at 1512.
[23] Id. at 1508.
[24] Id. at 1526.
[25] Id. at 1532-33.
[26] On January 30, 1997, Mr. Burks gave a recorded statement to Detective William Webb of the Tacoma Police Department relating the conversation he had with Co-defendant Wilson the morning of January 25, 1997. Prior to making that statement, Mr. Burks had a telephone conversation with Detective Tom Davidson, at which time he denied any knowledge of the event. He admits he did not tell Detective Davidson the truth, but testified his statement to Detective Webb was true. Id. at 1509-11; see Report of Proceedings (Jan. 29, 1998) at 1710-11; see also Report of Proceedings (Feb. 3, 1998) at 1913-14. Mr. Burks also testified he was intoxicated the night of the event and was afraid of Appellant. Report of Proceedings (Jan. 27, 1998) at 1516 and 1520.
[27] Report of Proceedings (Jan. 22, 1998) at 1260-61.
[28] Id. at 1260.
[29] Id. at 1261.
[30] Id.
[31] Report of Proceedings (Feb. 3, 1998) at 1992.
[32] Report of Proceedings (Jan. 22, 1998) at 1261.
[33] Id. at 1261-62.
[34] Id. at 1262.
[35] Id.
[36] Id. at 1262-63.
[37] Id. at 1263.
[38] Id. at 1263-64.
[39] Report of Proceedings (Jan. 23, 1998) at 1311.
[40] Report of Proceedings (Feb. 10, 1998) at 2377.
[41] Report of Proceedings (Jan. 23, 1998) at 1312.
[42] Id. at 1313.
[43] Report of Proceedings (Jan. 22, 1998) at 1264-65.
[44] Id. at 1268-69.
[45] See Report of Proceedings (Jan. 23, 1998) at 1309.
[46] Id. at 1313-14.
[47] Id. at 1313-19.
[48] Id.
[49] Id. at 1319.
[50] Id. at 1309-14.
[51] Report of Proceedings (Jan. 22, 1998) at 1272-73.
[52] Report of Proceedings (Jan. 27, 1998) at 1438; see Report of Proceedings (Feb. 3, 1998) at 1927.
[53] Report of Proceedings (Feb. 3, 1998) at 1927-28.
[54] Report of Proceedings (Jan. 27, 1998) at 1335 and 1437. (Comet cleanser, a powdery scrubbing agent, is commonly known to destroy latent fingerprints).
[55] Report of Proceedings (Jan. 27, 1998) at 1494-95.
[56] Id. at 1454; Report of Proceedings (Jan. 22, 1998) at 1335.
[57] Id. at 1476.
[58] See Id. at 1440.
[59] Report of Proceedings (Jan. 23, 1998) at 1339-40; Report of Proceedings (Feb. 3, 1998) at 1943-44; Report of Proceedings (Feb. 4, 1998) at 2073.
[60] Report of Proceedings (Jan. 23, 1998) at 1337-39.
[61] Id. at 1337.
[62] Report of Proceedings (Jan. 27, 1998) at 1473-74.
[63] Id.
[64] Id. at 1475.
[65] Report of Proceedings (Jan. 23, 1998) at 1328-29.
[66] Report of Proceedings (Feb. 4, 1998) at 2045-50.
[67] Id. at 2051-52.
[68] Id. at 2067.
[69] Id. at 2057 and 2061-63.
[70] Id. at 2063-64.
[71] Id.
[72] Id. at 2057-64.
[73] Id. at 2060.
[74] Id. at 2054.
[75] Id. at 2055.
[76] Id. at 2069.
[77] Id. at 2069-71.
[78] Id. at 2074.
[79] Id. at 2072-73.
[80] Report of Proceedings (Jan. 27, 1998) at 1537-40.
[81] See Report of Proceedings (Jan. 29, 1998) at 1748-49.
[82] Report of Proceedings (Jan. 27, 1998) at 1546.
[83] Id. at 1547.
[84] Id. at 1553.
[85] See Id. at 1474 (State's Exhibit Number 93.)
[86] Report of Proceedings (Feb. 4, 1998) at 2065.
[87] Report of Proceedings (Jan. 29, 1998) at 1716 and 1737-39. ("flat oval shape ... flat ribbon shape ... tightly curled....").
[88] Id. at 1739.
[89] Report of Trial Judge, dated March 10, 1998 at 2; see Clerk's papers at 552.
[90] See Report of Proceedings (Jan. 29, 1998) at 1749-52.
[91] Id. at 1730.
[92] Id. at 1759-63.
[93] Id. at 1767-68.
[94] See id.
[95] Report of Proceedings (Jan. 29, 1998) at 1664.
[96] Id. at 1673.
[97] Id. at 1676-77.
[98] Id. at 1687-89.
[99] Report of Proceedings (Feb. 4, 1998) at 2111-12.
[100] Id. at 2144.
[101] Id. at 2149-51. Ms. Couch was Asian American of Japanese descent.
[102] Report of Proceedings (Feb. 3, 1998) at 1956-57.
[103] Id. at 1955-56.
[104] Id. at 1969-71; see Report of Proceedings (Jan. 27, 1998) at 1558-59.
[105] See Report of Proceedings (Jan. 27, 1998) at 1559.
[106] Report of Proceedings (Feb. 2, 1998) at 1876.
[107] Id. at 1875.
[108] Id. at 1876-77 and 1880.
[109] Id.
[110] Id. at 1876-78.
[111] Report of Proceedings (Feb. 3, 1998) at 1964.
[112] Id. at 1964-69.
[113] Id. at 2033.
[114] Id. at 2034.
[115] Report of Proceedings (Feb. 2, 1998) at 1837-39.
[116] Id. at 1839.
[117] Id. at 1847.
[118] Id. at 1896.
[119] Id.
[120] Id. at 1897.
[121] Report of Proceedings (Feb. 2, 1998) at 1839.
[122] Id. at 1839-40.
[123] Id. at 1790-91.
[124] Id. at 1883.
[125] Id. at 1884.
[126] Id. at 1802.
[127] Id. at 1789-90 and 1898.
[128] Id. at 1790.
[129] Id. at 1857-59.
[130] Id. at 1798-1800.
[131] Id. at 1867.
[132] Report of Proceedings (Feb. 3, 1998) at 1981.
[133] Report of Proceedings (Feb. 2, 1998) at 1869.
[134] Id. at 1868.
[135] Id. at 1870.
[136] Id. at 1871.
[137] Id.
[138] Id.
[139] Appellant was arrested on January 28, 1997 on an unrelated warrant. See Report of Proceedings (Jan. 22, 1998) at 1155-58. He was arrested on the charge in this case on January 30, 1997.
[140] Report of Proceedings (Feb. 3, 1998) at 1998-99.
[141] Id. at 1999.
[142] Id. at 2000.
[143] Id.
[144] Clerk's Papers at 1-2.
[145] Id.
[146] Id. at 160-61.
[147] Id. at 1-2.
[148] Id. at 13.
[149] In a pretrial motion before Judge Sebring, Appellant moved to exclude the statements by Co-defendant Wilson to Keith D. Burks concerning the role Appellant played in the killing of Ms. Couch. Appellant argued admission of the statements would violate his Sixth Amendment right to confrontation. The trial court denied the motion and ruled the statements were excited utterances under Evidence Rule (ER) 803(a)(2) that did not offend the confrontation clause. (Clerk's Paper's at 350-52).
[150] Report of Proceedings (Nov. 12, 1997) at 2-5.
[151] Report of Proceedings (Nov. 12, 1997) at 7. CrR 6.11(a) provides: "Disability of Judge During Jury Trial." If, before the judge submits the case to the jury, he is unable to continue with the trial, any other judge assigned to or regularly sitting in the court, upon familiarizing himself with the record of the trial, may proceed with the trial. Upon defendant's objection to the replacement, a mistrial shall be granted.
[152] Report of Proceedings (Feb. 6, 1998) at 2306-07; see RCW 10.95.020(11)(a), (b), or (c).
[153] Report of Proceedings (Feb. 6, 1998) at 2307.
[154] Appellant claimed inconsistent verdicts because the jury on Verdict Form A found him "guilty" of murder in the first degree, and on the interrogatory found him "guilty" of both aggravated premeditated murder and felony murder, in addition to finding, on the Special Verdict Aggravating Circumstances Form, that there were three aggravating circumstances. Report of Proceedings (Feb. 9, 1998) at 2318-23.
[155] The trial court relied upon State v. Howland, 66 Wash.App. 586, 832 P.2d 1339 (1992), review denied, 121 Wash.2d 1006, 848 P.2d 1263 (1993), reasoning that "the felony murder is merged in the aggravated murder, premeditated in the first degree[,] ... [a]nd as long as the court doesn't sentence under the felony murder, the defendant is not prejudiced." Id. at 2322-23.
[156] Report of Proceedings (Feb. 12, 1998) at 2553-54.
[157] Report of Trial Judge, dated March 10, 1998 at 13.
[158] Turner v. Murray, 476 U.S. 28, 36 n. 9, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986).
[159] Washington Constitution, article I, sections 3 and 22.
[160] State v. Parnell, 77 Wash.2d 503, 507, 463 P.2d 134 (1969).
[161] Parnell, 77 Wash.2d at 507, 463 P.2d 134 (quoting Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)).
[162] Id. at 508, 463 P.2d 134.
[163] Formal proceeding at beginning of a jury trial in which counsel and the court ask questions of prospective jurors testing their qualifications to serve. See BLACK'S LAW DICTIONARY 1569 (7TH ed.1999).
[164] Morgan v. Illinois, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); see United States v. Sarkisian, 197 F.3d 966 (9th Cir. 1999); see State v. Laureano, 101 Wash.2d 745, 758, 682 P.2d 889 (1984) (citing State v. Robinson, 75 Wash.2d 230, 231-32, 450 P.2d 180 (1969)).
[165] Ristaino v. Ross, 424 U.S. 589, 594-95, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976), (quoting Connors v. United States, 158 U.S. 408, 413, 15 S.Ct. 951, 39 L.Ed. 1033 (1895)).
[166] Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).
[167] Id.
[168] See United States v. Jones, 722 F.2d 528, 529 (9th Cir.1983).
[169] United States v. Robinson, 475 F.2d 376, 380 (D.C.Cir.1973); Haslam v. United States, 431 F.2d 362 (9th Cir.1970); adhered to on rh'g, 437 F.2d 955, cert. denied, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971).
[170] Report of Trial Court Judge (Mar. 10, 1998) at 2; see Juror Questionnaire (Appellant and Co-defendant George Anthony Wilson are African American.); Clerk's Papers at 552.
[171] Report of Trial Court Judge (Mar. 10, 1998) at 8.
[172] Formal act by the court on its own without a motion or request by any party to the proceeding. See BLACK'S LAW DICTIONARY 1437 (7 TH ed.1999).
[173] Report of Trial Court Judge (Mar. 10, 1998) at 12. The trial judge did not instruct the jury on exclusion of race or ethnic origin at trial.
[174] Laureano, 101 Wash.2d at 758, 682 P.2d 889 (quoting State v. Tharp, 42 Wash.2d 494, 499, 256 P.2d 482 (1953)).
[175] See Report of Proceedings at 71, 133, 176, 224, 273, 292, 711, 908, 915, 940, 967, 1001 and 1073-74, respectively.
[176] See Appellant's Reply Br. at 1 ("Appellant agrees with [R]espondent that primary responsibility for conducting voir dire under Washington practice lay with [Appellant's] trial counsel.").
[177] There is nothing in the record to indicate that defense counsel was not satisfied with the jury panel as constituted.
[178] The subject of race was mentioned thirteen times during voir dire to jurors: number 1, 6, 8, 16, 18, 20, 61, 87, 89, 90, 52, 94 and 96. See Report of Proceedings at 71, 133, 176, 224, 273, 292, 711, 908, 915, 940, 967, 1001 and 1073-74. The fifteen jurors selected included jurors number 5, 6, 9, 15, 16, 18, 20, 28, 36, 54, 61, 66, 76, 77 and 82.
[179] Turner, 476 U.S. at 36 n. 8, 106 S.Ct. 1683.
[180] Rosales-Lopez, 451 U.S. at 190, 101 S.Ct. 1629.
[181] McCleskey v. Kemp, 481 U.S. 279, 311, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).
[182] McCleskey, 481 U.S. at 311, 107 S.Ct. 1756 ("The capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant.").
[183] Id. at 312, 107 S.Ct. 1756 (alteration in original) (quoting Kenneth Culp Davis, Discretionary Justice 170 (1973)).
[184] Turner, 476 U.S. at 36 n. 8, 106 S.Ct. 1683.
[185] Mu'Min v. Virginia, 500 U.S. 415, 422, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (affirming the capital murder conviction of a defendant, holding that his Sixth and Fourteenth Amendment rights under the United States Constitution were not violated when a trial judge properly exercised his broad discretion in refusing to question the venire about specific contents of news reports to which they had been exposed).
[186] See Mu'Min, 500 U.S. at 422-23, 111 S.Ct. 1899 (citing Connors v. United States, 158 U.S. 408, 413, 15 S.Ct. 951, 39 L.Ed. 1033 (1895); Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054, 73 A.L.R. 1203 (1931); and Rosales-Lopez v. United States, 451 U.S. at 189, 101 S.Ct. 1629).
[187] See id. at 422, 111 S.Ct. 1899 (citing Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); Ristaino v. Ross, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258, and Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27).
[188] Id.
[189] Id. at 422, 111 S.Ct. 1899 (quoting Connors, 158 U.S. at 413, 15 S.Ct. 951).
[190] Id. at 422-23, 111 S.Ct. 1899 (quoting Aldridge, 283 U.S. at 311, 51 S.Ct. 470).
[191] See Rosales-Lopez, 451 U.S. at 184-94, 101 S.Ct. 1629.
[192] See Ham, 409 U.S. at 525-29, 93 S.Ct. 848.
[193] Ristaino, 424 U.S. at 597, 96 S.Ct. 1017.
[194] Id. at 595, 96 S.Ct. 1017 (footnote omitted).
[195] Turner, 476 U.S. at 36-37, 106 S.Ct. 1683.
[196] Id. at 33, 106 S.Ct. 1683 (quoting Turner v. Bass, 753 F.2d 342, 345-46 (4th Cir.1985)).
[197] Id. at 37-38, 106 S.Ct. 1683.
[198] Ristaino, 424 U.S. at 596 n. 8, 96 S.Ct. 1017.
[199] Aldridge, 283 U.S. at 310-11, 51 S.Ct. 470.
[200] 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258.
[201] Rosales-Lopez, 451 U.S. at 189-90, 101 S.Ct. 1629 (quoting Ristaino, 424 U.S. at 597, 96 S.Ct. 1017).
[202] Rosales-Lopez, 451 U.S. at 187-88, 101 S.Ct. 1629.
[203] Id. at 190, 101 S.Ct. 1629.
[204] Id. at 192, 101 S.Ct. 1629.
[205] Id. at 190, 101 S.Ct. 1629.
[206] Turner, 476 U.S. at 35, 106 S.Ct. 1683 (The Supreme Court observed that in such cases "[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected.") Id. at 38 n. 12, 106 S.Ct. 1683. ("[T]he decisions that sentencing jurors must make involve far more subjective judgments than when they are deciding guilt or innocence.").
[207] McCleskey, 481 U.S. at 310, 107 S.Ct. 1756 (citing Turner, 476 U.S. at 36 n. 9, 106 S.Ct. 1683).
[208] The Washington statute, RCW 10.95.070, like the Virginia statute, Va.Code Ann. § 19.2-264.2 and § 19.2-264.4(B) (Lexis 2000), gives jurors a wide range of discretion in evaluating a defendant's future dangerousness, in addition to considering other circumstances.
[209] Turner, 476 U.S. at 36-37, 106 S.Ct. 1683.
[210] Id. at 37 n. 10, 106 S.Ct. 1683.
[211] Id.
[212] Id. at 37, 106 S.Ct. 1683.
[213] Morgan, 504 U.S. at 729, 112 S.Ct. 2222.
[214] See Br. of Appellant at 47-48.
[215] Id. at 48. Appellant does not argue the Gunwall factors. See State v. Gunwall, 106 Wash.2d 54, 61-62, 720 P.2d 808, 76 A.L.R. 4th 517 (1986).
[216] State v. Brown, 132 Wash.2d 529, 594, 940 P.2d 546 (1997); see State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808.
[217] See Br. of Appellant at 46-47.
[218] Appellant cites State v. Bartholomew, 101 Wash.2d 631, 640, 683 P.2d 1079 (1984), for the proposition that the Washington Constitution is not limited to the United States Supreme Court's interpretation of the Sixth and Fourteenth Amendments of the United States Constitution.
[219] The trial judge indicated in his report that the race or ethnic origin of the Appellant, victim or any witness was not an apparent factor at trial. Report of Trial Court Judge (Mar. 10, 1998) at 10.
[220] In the trial court's initial statements, it recited the "Death Penalty Opening Jury Instruction" to the venire which informed them that the purpose of voir dire examination was to select an "impartial jury," which would decide the case solely "upon the law and the facts;" one that is "unbiased and without preconceived ideas which might affect the case." Report of Proceedings (Jan. 5, 1998) at 22-23.
[221] The Africian American race of Appellant and his co-defendant were disclosed in the jury questionnaire. The Japanese American race of the victim, Ms. Yoshiko Couch, was not.
[222] The document entitled "To Prospective Jurors" did not mention the race of either Appellant, his co-defendant or Ms. Couch.
[223] Report of Proceedings (Jan. 21, 1998) at 1117, 1137-40.
[224] The other issues prospective jurors were questioned about during voir dire included their views on such subjects as potentially gruesome photographs, publicity in the local newspaper, accomplice liability and DNA evidence.
[225] Report of Proceedings (Jan. 21, 1998) at 1129 and 1142-43. A peremptory challenge is an objection for which no reason need be given and upon which the court will exclude the juror. See RCW 4.44.140.
[226] See id. at 1112-13. (Trial court advised that each side had sixteen peremptory challenges.) Appellant exercised fourteen peremptory challenges. The State exercised eleven. Clerk's Papers at 1023-24.
[227] State v. Elmore, 139 Wash.2d 250, 277-78, 985 P.2d 289 (1999) (citing State v. Tharp, 42 Wash.2d 494, 500, 256 P.2d 482 (1953) petition for cert. filed (May 15, 2000) (defendant must use all his peremptory challenges or he cannot show prejudice based on the selection and retention of a particular juror and is barred from any corresponding claim of error); State v. Collins, 50 Wash.2d 740, 744, 314 P.2d 660 (1957) (prosecuting attorney's voir dire of panel did not prejudice the defendant, where the defendant accepted the panel while not exercising four peremptory challenges); State v. Gentry, 125 Wash.2d 570, 616, 888 P.2d 1105 (1995) (defendant's constitutional right to a fair trial by an impartial jury was not violated where the defendant participated in voir dire and accepted the jury panel)).
[228] In this case, no persons of Appellant's or the victim's race or ethnic orgin were on the jury. See Report of Trial Judge (Mar. 10, 1998) at 10-11.
[229] See State v. Green, 70 Wash.2d 955, 961-62, 425 P.2d 913 (1967); see Report of Trial Judge (Mar. 10, 1998) at 10 (Trial judge indicated that under 10% of the population of Pierce County is the same ethnic origin as the defendant.).
[230] See Death Penalty Opening Jury Instruction, Clerk's Papers at 22-23.
[231] Turner, 476 U.S. at 33-34, 106 S.Ct. 1683.
[232] Id. at 35 n. 7, 106 S.Ct. 1683.
[233] Ristaino, 424 U.S. at 594, 96 S.Ct. 1017.
[234] Turner, 476 U.S. at 37, 106 S.Ct. 1683.
[235] ER 803(a)(2) is identical to the federal rule, Fed.R.Evid. 803(a)(2).
[236] See Br. of Appellant at 55.
[237] See Br. of Appellant at 57. While Appellant does not suggest the Washington Constitution provides greater protection than the United States Constitution concerning this assignment of error, he does claim it was "prosecutorial misconduct" for the prosecuting attorneys to offer the testimony of Mr. Burks, only to later "impeach the `excited utterance' through the testimony of Asil Hubley." See id. at 52-57; Appellant's Reply Br. at 5-6. Appellant suggests the testimony of Mr. Burks and Mr. Hubley are impermissibly linked; Mr. Hubley's testimony allegedly contradicts Co-defendant Wilson's statements to Mr. Burks; and suggests Mr. Wilson's statements were fabricated.
[238] State v. Pirtle, 127 Wash.2d 628, 672, 904 P.2d 245 (1995).
[239] See State v. Palomo, 113 Wash.2d 789, 798, 783 P.2d 575 (1989) (quoting Dutton v. Evans, 400 U.S. 74, 88, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970)).
[240] See Second Corrected Br. of Resp't at 54-57; see also Clerk's Papers at 350-52 (pretrial order admitting Defendant Wilson's statements as excited utterances by Judge Sebring in open court on June 24, 1997).
[241] See Second Corrected Br. of Resp't at 61-75.
[242] Lilly v. Virginia, 527 U.S. 116, 123-24, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (citing Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (Sixth Amendment applies to the states)).
[243] State v. Strauss, 119 Wash.2d 401, 417, 832 P.2d 78 (1992).
[244] 127 Wash.2d 749, 903 P.2d 459 (1995).
[245] Brown, 127 Wash.2d at 757-59, 903 P.2d 459.
[246] Co-defendant Wilson spoke to Mr. Hubley two days after his conversation with Mr. Burks. Clerk's Papers at 670.
[247] Report of Proceedings (Jan. 27, 1998) at 1532.
[248] Report of Proceedings (Feb. 2, 1998) at 1870-71.
[249] See ER 801(c); ER 802.
[250] ER 801(d)(1) (Prior Statement by Witness) and (2) (Admission by Party-Opponent).
[251] ER 802.
[252] A hearsay statement within the excited utterance exception may be admitted without showing the declarant is unavailable as a witness. See White v. Illinois, 502 U.S. 346, 356-57, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); Palomo, 113 Wash.2d at 798, 783 P.2d 575.
[253] Palomo, 113 Wash.2d at 796-98, 783 P.2d 575.
[254] State v. Chapin, 118 Wash.2d 681, 686, 826 P.2d 194 (1992).
[255] Report of Proceedings (Jan. 27, 1998) at 1508-09.
[256] Chapin, 118 Wash.2d at 688, 826 P.2d 194.
[257] Id.
[258] Id.
[259] See id.; see also State v. Hardy, 133 Wash.2d 701, 714, 946 P.2d 1175 (1997).
[260] Report of Proceedings (Jan. 27, 1998) at 1526.
[261] Id. at 1507-08.
[262] 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).
[263] See Br. of Appellant at 49-52.
[264] Lilly, 527 U.S. at 123-24, 119 S.Ct. 1887 (quoting Maryland v. Craig, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)).
[265] Id. at 124, 119 S.Ct. 1887 (citing California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)).
[266] Idaho v. Wright, 497 U.S. 805, 813, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).
[267] Maryland, 497 U.S. at 849-50, 110 S.Ct. 3157 (quoting Roberts, 448 U.S. at 63, 100 S.Ct. 2531).
[268] 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).
[269] Roberts, 448 U.S. at 66, 100 S.Ct. 2531; see Lilly, 527 U.S. at 124-25, 119 S.Ct. 1887.
[270] White, 502 U.S. at 357, 112 S.Ct. 736.
[271] Id. at 356 n. 8, 112 S.Ct. 736.
[272] See, e.g., White v. Illinois, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); United States v. Inadi, 475 U.S. 387, 106 S.Ct. 1121, 1126, 89 L.Ed.2d 390 (1986).
[273] 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117.
[274] Lilly, 527 U.S. at 121-22, 119 S.Ct. 1887.
[275] Id. at 134, 119 S.Ct. 1887; see Lee v. Illinois, 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (A co-defendant's confession obtained by police interrogation was "presumptively unreliable" because it did not bear a sufficient indicia of reliability, based upon a determination that "arrest statements of a co-defendant have traditionally been viewed with special suspicion." The Court explained, referring to its holding in Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), that "when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subject to the scrutiny of cross-examination."); see State v. Rice, 120 Wash.2d 549, 567, 844 P.2d 416 (1993) (A co-conspirator's hearsay statement which inculpates a co-conspirator made during interrogation in police custody is unreliable for Confrontation Clause purposes.)
[276] 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).
[277] Lilly, 527 U.S. at 132 n. 2, 119 S.Ct. 1887.
[278] Id. (citation omitted) (emphasis added) (citing Dutton, 400 U.S. at 86-89, 91 S.Ct. 210) (The Supreme Court concluded where twenty witnesses, including an eyewitness to the murder, testified for the State, defense counsel had ample opportunity to cross-examine them, including the State's witness who testified that defendant's co-conspirator stated, while both were incarcerated in prison, that if it had not been for defendant "we wouldn't be in this now," on the issue of whether the co-conspirator had actually made the statement, was "spontaneous, and ... was against [co-conspirator's] penal interest to make it." The Court found sufficient indicia of reliability that warranted admission of the co-conspirator's hearsay statement as testified to by the witness, and defendant's rights under the Confrontation Clause were not violated. Dutton, 400 U.S. at 77-89, 91 S.Ct. 210).
[279] Lilly, 527 U.S. at 126, 119 S.Ct. 1887 (citing White, 502 U.S. at 355-56, 112 S.Ct. 736).
[280] State v. Whelchel, 115 Wash.2d 708, 715, 801 P.2d 948 (1990) (Trial court committed harmless error in admitting tape recorded hearsay statement of nontestifying co-defendants against the defendant at trial under the statements against penal interest hearsay exception.)
[281] Whelchel, 115 Wash.2d at 715, 801 P.2d 948 (Adequate indicia of reliability under Roberts is "presumed" if the statement falls within a firmly rooted hearsay exception, "[o]therwise, the evidence must be excluded absent a showing of trustworthiness."). This Court has articulated nine factors in determining the trustworthiness of hearsay statements: "(1) whether the declarant had apparent motive to lie; (2) whether the general character of the declarant suggests trustworthiness, (3) whether more than one person heard the statement, (4) whether the statement was made spontaneously, (5) whether the timing of the statement and the relationship between the declarant and witness suggest trustworthiness, (6) whether the statement contained expressed assertions of past fact, (7) whether cross examination could not help to show the declarant's lack of knowledge, (8) whether the possibility of the declarant's recollection being faulty is remote, and (9) whether the circumstances surrounding the statements give no reason to suppose that the declarant misrepresented the defendant's involvement.") Id. at 722-25, 801 P.2d 948; see State v. Anderson, 107 Wash.2d 745, 733 P.2d 517 (1987) (Hearsay statements made by a nontestifying co-defendant and introduced by the State against the defendant as a declaration against penal interest exception to the hearsay rule under ER 804(b)(3) do not violate the defendant's rights under the Confrontation Clause because there is a sufficient indicia of reliability guaranteeing the trustworthiness of the statements.)
[282] Br. of Appellant at 78; Report of Proceedings (Jan. 27, 1998) at 1527.
[283] Br. of Appellant at 78.
[284] Second Corrected Br. of Resp't at 78-79.
[285] State v. Powell, 126 Wash.2d 244, 256, 893 P.2d 615 (1995).
[286] State v. Latham, 35 Wash.App. 862, 866-67, 670 P.2d 689, review denied, 100 Wash.2d 1035 (1984).
[287] Under RAP 2.5(a), claims of error raised for the first time on appeal will be considered if the claimed error concerns (1) lack of trial court jurisdiction, (2) failure to establish facts upon which relief can be granted, and (3) manifest error affecting a constitutional right. An objection to the admissibility of evidence must be made to the trial court in order to preserve a claim of error on appeal. ER 103(a).
[288] Br. of Appellant at 49.
[289] Id. at 53.
[290] Report of Proceedings (Feb. 2, 1998) at 1870-71.
[291] Id.
[292] Report of Proceedings (Jan. 22, 1998) at 1231-32; see Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
[293] Report of Proceedings (Jan. 26, 1998) at 1368.
[294] Id. at 1370.
[295] Id. at 1421.
[296] Id.
[297] Br. of Appellant at 74.
[298] See id. at 75-76; Report of Proceedings (Jan. 22, 1998) at 1193-96.
[299] See Br. of Appellant at 76-78.
[300] Second Corrected Br. of Resp't at 75-76.
[301] State v. Finch, 137 Wash.2d 792, 812, 975 P.2d 967 (1999) (citing Lord, 117 Wash.2d at 870, 822 P.2d 177).
[302] Elmore, 139 Wash.2d at 310, 985 P.2d 289 (citing State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971)).
[303] Id. (citing State v. Blight, 89 Wash.2d 38, 41, 569 P.2d 1129 (1977)).
[304] Finch, 137 Wash.2d at 812, 975 P.2d 967 (citing Lord, 117 Wash.2d at 871, 822 P.2d 177).
[305] Report of Proceedings (Jan. 22, 1998) at 1190-91; Report of Proceedings (Jan. 23, 1998) at 1328-29.
[306] Report of Proceedings (Jan. 22, 1998) at 1196-97.
[307] According to Appellant, the statistics revealed there were "29,199 Hispanics and 8,826 Asians in Pierce County." He argues such information was relevant to show how many Japanese/Asian people in Pierce County were potential donors of the blood found on Appellant's shoe. Br. of Appellant at 84.
[308] Id. at 85. The Internet is a worldwide electronic communication and information network accessible principally through use of computers. Data may be printed in hard copy. ER 902(e) defines "official publications" as "[b]ooks, pamphlets, or other publications purporting to be issued by public authority" which are admissible as self-authenticating documents.
[309] Second Corrected Br. of Resp't at 81.
[310] State v. Rivers, 129 Wash.2d 697, 709, 921 P.2d 495 (1996).
[311] RCW 5.44.040.
[312] Br. of Appellant at 60-61. Appellant also urges this Court to abandon the well-settled Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), standards of review in death qualifying jurors, in favor of the Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), standard. Yet, Appellant provides no persuasive authority to do so in this case. See Gentry, 125 Wash.2d at 635, 888 P.2d 1105 (citing In re Lord, 123 Wash.2d at 296, 868 P.2d 835; Rupe, 108 Wash.2d at 734, 743 P.2d 210; Mak, 105 Wash.2d at 692, 718 P.2d 407).
[313] Second Corrected Br. of Resp't at 48.
[314] State v. Brett, 126 Wash.2d 136, 157, 892 P.2d 29 (1995) (citing State v. Rupe, 108 Wash.2d at 748, 743 P.2d 210).
[315] Elmore, 139 Wash.2d at 278-79, 985 P.2d 289.
[316] Id. at 279, 985 P.2d 289 (citing Brett, 126 Wash.2d at 157, 892 P.2d 29); Personal Restraint Petition of Lord, 123 Wash.2d 296, 307-08, 868 P.2d 835 (1994) (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)).
[317] Gentry, 125 Wash.2d at 634, 888 P.2d 1105 (citing Wainwright, 469 U.S. at 425-26, 105 S.Ct. 844).
[318] Id.
[319] Lord, 123 Wash.2d at 309, 868 P.2d 835 (Some alterations in original).
[320] Report of Proceedings (Jan. 7, 1998) at 127 and 131.
[321] Id. at 146-47.

Defense counsel asked juror number 6 the following questions and the responses were given:
Defense Counsel: Just like in the trial, the defense doesn't have to put on any mitigating factors.... Does the fact that ... you may hear no evidence on Mr. Davis' behalf, ... leave you to think you probably would vote for the death penalty?
Juror number 6: If ... the only evidence ... presented to me was by the prosecutors, then if they offered and no rebuttal ... I wouldn't be left with any other choice.
Defense Counsel: And again, I don't want to put words in your mouth, but if there were no mitigating factors present, then you feel like you would have to vote for the death penalty?
Juror number 6: Yes.
Defense Counsel: And please don't let me put words in your mouth if I misstated that. You feel you would have to vote for it then?
Juror number 6: Yes, I would.
[322] Id. at 146-53. Defense counsel objected to juror number 6 for cause. The Court said her questions were confusing and suggested she rephrase them. Defense counsel asked juror number 6: "Even if the defense puts on no evidence, you're still going to make [the State] prove beyond a reasonable doubt that there isn't any reason to impose life without parole? He answered "That's correct."
[323] Br. of Appellant at 60-63.
[324] Second Corrected Br. of Resp't at 49.
[325] Gentry, 125 Wash.2d at 634, 888 P.2d 1105 (citing State v. Mak, 105 Wash.2d 692, 707, 718 P.2d 407, cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); Wainwright v. Witt, 469 U.S. at 424, 105 S.Ct. 844; Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581; Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776).
[326] Brett, 126 Wash.2d at 157, 892 P.2d 29.
[327] Elmore, 139 Wash.2d at 278-79, 985 P.2d 289.
[328] Report of Proceedings (Jan. 13, 1998) at 546-47 (The Prosecutor asked: "if you have a choice of life without parole, could you under any circumstances, given that other choice, vote for the death penalty?" Juror number 50 replied: "No, I don't think I could vote for the death penalty if there was a chance that there would be life without parole.").
[329] Report of Proceedings (Jan. 12, 1998) at 487-88.

The Court: Let me make sure that I am understanding you. You have indicated that you would want to be 100 percent certain of the person's guilt [before voting for the death penalty]?
Juror number 38: Right.
The Court: The law requires proof beyond a reasonable doubt. Not proof to a 100 percent certainty. Would you require proof to a 100 percent certainty before you would vote for death?
Juror number 38: Right.
[330] Br. of Appellant at 79.
[331] Id. at 81-83.
[332] Second Corrected Br. of Resp't at 83-87.
[333] Id. at 88-89.
[334] Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527 (1932); Washington Constitution, article I, section 22.
[335] Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981).
[336] Cuyler v. Sullivan, 446 U.S. 335, 346-49, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980) (In Sullivan, three co-defendants were represented by the same two lawyers who were paid partially by funds raised by friends of the three defendants; no part of the balance of their fee was paid by Defendant Sullivan or his family. Defendant Sullivan's trial preceded his co-defendants' individual trials. He was convicted while his co-defendants were acquitted.).
[337] Cuyler, 446 U.S. at 350, 100 S.Ct. 1708.
[338] See id. at 348-49, 100 S.Ct. 1708 (Emphasis added).
[339] Id. at 346-47, 100 S.Ct. 1708.
[340] Id. The Supreme Court clarified that trial courts necessarily rely upon defense counsel's professional and ethical duty to avoid conflicting representations that exist or will develop during the trial.
[341] Prior to Mr. Johnson's testimony, the parties discussed the admissibility of his criminal history. The parties agreed his misdemeanor convictions would not be admitted, with the exception of an obstruction conviction. Appellant Davis' counsel wanted to review the police report regarding that conviction before agreeing to its inadmissibility. Report of Proceedings (Jan 28, 1998) at 1589-91.
[342] Id.
[343] 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).
[344] 100 Wash.2d 669, 675 P.2d 209 (1983).
[345] Holloway, 435 U.S. at 484, 98 S.Ct. 1173.
[346] Id. at 477-80, 98 S.Ct. 1173.
[347] Id. at 479, 98 S.Ct. 1173.
[348] Cuyler, 446 U.S. at 346-47, 100 S.Ct. 1708.
[349] In re Richardson, 100 Wash.2d at 671-72, 675 P.2d 209.
[350] Id.
[351] Wood, 450 U.S. at 272, 101 S.Ct. 1097 (In Wood, three co-defendants, while employed at the same adult theatre and bookstore, were convicted of distributing obscene materials. They were represented by the same lawyer who was retained and paid by their employer. At their probation revocation hearing, the Supreme Court observed "the [trial] court must have known that it had imposed disproportionately large finespenalties that almost certainly were increased because of an assumption that the employer would pay the fines[,] and [t]he court did know that petitioners' counsel had been provided by that employer and was pressing a constitutional attack rather than making the arguments for leniency that might well have resulted in substantial reductions in, or deferrals of, the fines." Id. at 266-68 and 272-73, 101 S.Ct. 1097. The Supreme Court determined that based upon the record in the case, there was a clear "possibility of a conflict of interest ... sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further." Id. at 272, 101 S.Ct. 1097.)
[352] Richardson, 100 Wash.2d at 677, 675 P.2d 209.
[353] But see State v. White, 80 Wash.App. 406, 907 P.2d 310 (1995), review denied, 129 Wash.2d 1012, 917 P.2d 130 (1996).
[354] Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (citing Cuyler, 446 U.S. at 348-50, 100 S.Ct. 1708).
[355] Br. of Appellant at 80.
[356] See Strickland, 466 U.S. at 692, 104 S.Ct. 2052 (Actual conflict requires defense counsel must have actually represented conflicting interests.).
[357] Report of Proceedings (Feb. 3, 1998) at 1995-97.
[358] Id. at 2004-05.
[359] Jury Instruction Number 13 read:

If you find defendant Cecil Davis guilty of Premeditated Murder in the First Degree as defined in Instruction 9, you must then determine whether the following aggravating circumstance exists:
The murder was committed in the course of, in furtherance of, or in immediate flight from a Robbery in the First or Second Degree, a Rape in the First or Second Degree, or a Burglary in the First or Second Degree.
The State has the burden of proving the existence of an aggravating circumstance beyond a reasonable doubt. In order for you to find that there is an aggravating circumstance in this case, you must unanimously agree that the aggravating circumstances has been proved beyond a reasonable doubt. You need not be unanimous as to any one of the crimes listed within the aggravating circumstances. (Clerk's Papers at 859.)
[360] Jeffries, 110 Wash.2d 326, 752 P.2d 1338 cert. denied, 488 U.S. 948, 109 S.Ct. 379, 102 L.Ed.2d 368 (1988).
[361] Br. of Appellant at 85-86 and 90-91. Report of Proceedings (Feb. 5, 1998) at 2189.
[362] Id.
[363] Second Corrected Br. of Resp't at 91.
[364] Appellant cites Crossen v. Skagit County, 100 Wash.2d 355, 360, 669 P.2d 1244 (1983), as authority for its position. In Crossen, this Court concluded jury instructions are sufficient if they "(1) permit each party to argue his theory of the case, (2) are not misleading, and (3) when read as a whole, properly inform the trier of fact of the applicable law."
[365] RAP 2.5(a)(3); State v. McDonald, 138 Wash.2d 680, 981 P.2d 443 (1999).
[366] State v. WWJ Corp., 138 Wash.2d 595, 603, 980 P.2d 1257 (1999).
[367] State v. Deal, 128 Wash.2d 693, 698, 911 P.2d 996 (1996) (citing State v. Peterson, 73 Wash.2d 303, 306, 438 P.2d 183 (1968)).
[368] Report of Proceedings (Feb. 5, 1998) at 2188-89.
[369] State v. LeFaber, 128 Wash.2d 896, 913 P.2d 369 (1996).
[370] 110 Wash.2d 326, 752 P.2d 1338. This Court rejected defendant's argument that RCW 10.95.020(9) should be deconstructed into its disjunctive parts.
[371] Id. at 339-40, 752 P.2d 1338.
[372] 117 Wash.2d 829, 878, 822 P.2d 177 (1991).
[373] Id. at 877, 822 P.2d 177.
[374] Id. at 879-80, 822 P.2d 177.
[375] Br. of Appellant at 93.
[376] Id.
[377] Brett, 126 Wash.2d at 162-66, 892 P.2d 29.
[378] Clerk's Papers at 863-67 (Jury Instruction numbers 17, 18, and 19).
[379] Lord, 117 Wash.2d at 880-82, 822 P.2d 177.
[380] Report of Proceedings (Jan 27, 1998) at 1502-03.
[381] Report of Proceedings (Jan. 22, 1998) at 1261-62; Report of Proceedings (Jan. 27, 1998) at 1508-09.
[382] Report of Proceedings (Jan. 23, 1998) at 1317; Report of Proceedings (Jan. 27, 1998) at 1449-50; Report of Proceedings (Feb. 3, 1998) at 1974.
[383] Report of Proceedings (Feb. 4, 1998) at 2069-71.
[384] Appellant attacks the State's evidence of sexual assault, claiming only that the testimony of Mr. Burks was not credible. (Br. of Appellant at 94.)
[385] Second Corrected Br. of Resp't at 97-98.
[386] Jury Instruction Number 20 read:

To convict defendant Cecil Davis of the alternative crime of Felony Murder in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about the 25 th day of January, 1997, Yoshiko Couch was killed;
(2) That defendant Cecil Davis was committing or attempting to commit Robbery in the First or Second Degree, Rape in the First or Second Degree, or Burglary in the First or Second Degree;
(3) That defendant Cecil Davis caused the death of Yoshiko Couch in the course of and in furtherance of such crime or in immediate flight from such crime;
(4) That Yoshiko Couch was not a participant in the crime; and
(5) That the acts occurred in the State of Washington.
If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
The crimes listed in Elements Number (2) are alternatives. You must unanimously agree that defendant Cecil Davis was committing or attempting to commit one of those crimes, but you need not be unanimous as to any particular one of those crimes.
(Clerk's Papers at 868.)
[387] Clerk's Papers at 878-79.
[388] Even assuming the trial court's instruction was erroneous, it is well settled that error without prejudice is not grounds for reversal. See Thomas v. French, 99 Wash.2d 95, 104, 659 P.2d 1097 (1983); see also State v. White, 74 Wash.2d 386, 392, 444 P.2d 661 (1968).
[389] Appellant's Reply Br. at 17.
[390] Second Corrected Br. of Resp't at 101.
[391] Id. at 100 (citing Elmore, 985 P.2d at 314).
[392] Report of Proceedings (Feb. 12, 1998) at 2506-22, 2540-47.
[393] Gentry, 125 Wash.2d at 640, 888 P.2d 1105 (quoting State v. Hoffman, 116 Wash.2d 51, 93, 804 P.2d 577 (1991)).
[394] Id.; see State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997).
[395] "We're here to consider the death penalty, reserved only for the most heinous crime and the most awful criminals in our society. You consider the universe of criminal behavior and murder is a fairly small segment of it, first degree murder is smaller still, aggravated first degree murder is smaller yet, and among those aggravated murder cases the elected prosecutor has to decide which of those he would like to put before you, the question of the death penalty, assuming a conviction, and among that very small class of cases then of course the jury decides whether there are not sufficient grounds for leniency." Report of Proceedings (Feb. 12, 1998) at 2506 (emphasis added).
[396] "Thousands of years ago, when we had a less ordered society, it was the law of retribution ... carried out by individuals .... [b]ut ... a ... society ... was developed where we give up that right of vengeance and retribution ... to the State and it is channeled into a criminal justice system. Now, that doesn't mean that retribution, vengeance is gone, it's still part of the human condition, punishment, it should be there and it remains there, but we rely upon our instructions to carry it out. Now, if our courts of law, our institutions of justice, are unwilling to impose the ultimate penalty where appropriate, it sows the seeds of anarchy, it invites the lynch law. It is important that our instructions not violate the social contract between us." Id. at 2516-17 (emphasis added); see State v. Lord, 117 Wash.2d at 904, 822 P.2d 177.
[397] See State v. Rice, 110 Wash.2d 577, 608-09, 757 P.2d 889 (1988), cert denied, 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 707 (1989) (Prosecuting attorneys may ask the jury to view the crime from the victim's perspective.) (quoting People v. Haskett, 30 Cal.3d 841, 863-64, 640 P.2d 776, 180 Cal.Rptr. 640 (1982)) (The court in Haskett also referred to the death penalty as "the ultimate sanction" and concluded "the prosecution's invitation to the jurors to project themselves into the role of the surviving victim" was not inflammatory.)
[398] "We submit that when a society is unwilling to overlook the abhorrent acts of someone like Mr. Davis, and recognize that the death penalty is the only appropriate response, that represents civilized society and we put the focus where it belongs, a failure to impose a death penalty in a case like this, in other words, it cheapens all of our lives." Report of Proceedings (Feb. 12, 1998) at 2516-17. (Emphasis added.); see Rice, 110 Wash.2d at 608-09, 757 P.2d 889. The State may ask the jury to view the crime from the victim's perspective if the prosecuting attorney's argument is based upon facts surrounding the defendant's criminal acts admitted into evidence during the guilt phase. See Brown, 132 Wash.2d at 565, 940 P.2d 546. A prosecuting attorney in a capital case has "wide latitude" in arguing the evidence supports imposition of the death penalty.
[399] Report of Proceedings (Feb. 12, 1998) at 2518-19; see State v. Finch, 137 Wash.2d 792, 841-42, 975 P.2d 967 (1999) (citing United States v. Lester, 749 F.2d 1288, 1301 (9th Cir.1984)).
[400] See Finch, 137 Wash.2d at 841-42, 975 P.2d 967 (citing Lester, 749 F.2d at 1301).
[401] "There are certain murders where we must say no mercy is appropriate.... The defendant, he was merciless to Ms. Couch. You might consider showing him mercy in the same quality and degree and amount he showed her." Report of Proceedings (Feb. 12, 1998) at 2515-16 (emphasis added).
[402] See Finch, 137 Wash.2d at 842, 975 P.2d 967 (quoting Lester, 749 F.2d at 1301). ("`[A]ppeals for the jury to act as a conscience of the community are not impermissible, unless specifically designed to inflame the jury.'")
[403] Report of Proceedings (Feb. 12, 1998) at 2521.
[404] Id. at 2508.
[405] Id.; see Elmore, 139 Wash.2d at 292-93, 985 P.2d 289 (citing Brown, 132 Wash.2d at 561, 940 P.2d 546).
[406] RCW 10.95.130(2)(a), (b), (c), and (d).
[407] RCW 10.95.130(1).
[408] See Appellant's Br. at 38, 45-46.
[409] Report of Proceedings (Feb. 12, 1998) at 2554.
[410] Elmore, 139 Wash.2d at 305, 985 P.2d 289.
[411] Report of Proceedings (Feb. 10, 1998) at 2385; Report of Proceedings (Feb. 11, 1998) at 2440-46. Appellant's mother, Ms. Cozetta Taylor, testified that his three children, ages 3, 17 and 19, love him; see Report of Trial Judge, dated March 10, 1998 at 2.
[412] Report of Proceedings (Feb. 11, 1998) at 2437-38.
[413] Id. at 2439.
[414] Id. at 2440-42.
[415] See id. at 2444-45.
[416] Id. at 2429. The parties stipulated that Appellant had one major infraction during his period of incarceration in the Department of Corrections. Id. at 2447.
[417] Report of Proceedings (Feb. 10, 1998) at 2390-93.
[418] Id. at 2394-95.
[419] Id. at 2396.
[420] Id. at 2419.
[421] Id. at 2398-2406. Appellant's medical records revealed that, from a motor vehicle accident in 1982, he received multiple injuries to his body and his head which, according to Dr. Cripe, may have adversely affected his neurobehavioral functioning.
[422] Report of Proceedings (Feb. 11, 1998) at 2465-68.
[423] Id. at 2489 and 2500-01.
[424] Id. at 2470-72.
[425] Id. at 2474-75.
[426] See Elmore, 139 Wash.2d at 305, 985 P.2d 289.
[427] Report of the Trial Judge, dated March 10, 1998 at 13.
[428] Report of Proceedings (Feb. 10, 1998) at 2373.
[429] Id. at 2372.
[430] Id. at 2373-75.
[431] Id. at 2379-80.
[432] Id. at 2378.
[433] Id. at 2381.
[434] Id. 2368-69 and 2381.
[435] Elmore, 139 Wash.2d at 305, 985 P.2d 289 (citing Brown, 132 Wash.2d at 553, 940 P.2d 546).
[436] Brown, 132 Wash.2d at 554, 940 P.2d 546, citing Lord (117 Wash.2d at 907, 822 P.2d 177).
[437] Elmore, 139 Wash.2d at 307-08, 985 P.2d 289 (citing Brown (132 Wash.2d at 555, 940 P.2d 546)); see also Gentry, 125 Wash.2d at 655, 888 P.2d 1105.
[438] Elmore, 139 Wash.2d at 308, 985 P.2d 289 (citing Brown, 132 Wash.2d at 555, 940 P.2d 546).
[439] Compare Brown, 132 Wash.2d at 555, 940 P.2d 546 (citing Lord, 117 Wash.2d at 911, 822 P.2d 177) (suggesting a "family resemblances" approach) with State v. Benn, 120 Wash.2d 631, 680-93, 845 P.2d 289 (1993) (suggesting a statistically based approach).
[440] Elmore, 139 Wash.2d at 308, 985 P.2d 289 (citing Brown, 132 Wash.2d at 555, 940 P.2d 546).
[441] Id. citing Brown, 132 Wash.2d at 555-56, 940 P.2d 546.
[442] Brown, 132 Wash.2d at 555, 940 P.2d 546, citing Lord, 117 Wash.2d at 910, 822 P.2d 177.
[443] Elmore, 139 Wash.2d at 308, 985 P.2d 289 (quoting Dodd, 120 Wash.2d at 26, 838 P.2d 86); accord Lord, 117 Wash.2d at 910-11, 822 P.2d 177.
[444] Report of Proceedings (Jan. 27, 1998) at 1502-05.
[445] Report of Trial Judge, State v. Rupe, No. 81-1-00316-1 (Thurston County Super. Ct. June 7, 1983) (single gunshot wound to the head); Report of the Trial Judge, State v. Benn, No. 88-1-01280-8 (Pierce County Super. Ct. June 12, 1990) (multiple gunshot wounds to the torso and head); Report of the Trial Judge, State v. Hazen, No. 85-1-00322-5 (Clark County Super. Court April 21, 1986) (multiple gunshot wounds with no prior struggle); Report of the Trial Judge, State v. Harris, No. 84-1-01190-6 (Pierce County Super. Ct. Jan. 14, 1985) (multiple gunshot wounds; contract killing); Report of the Trial Judge, State v. Jeffries, (Clallam County Super. Ct. Nov. 18, 1983) (multiple gunshot wounds); Report of Trial Judge, State v. Gentry, No. 88-1-00395-3 (Kitsap County Super. Ct. July 22, 1991) (victim chased, sexually assaulted and bludgeoned to death); Report of Trial Judge, State v. Lord, No. 86-1-00470-8 (Kitsap County Super. Ct. Aug. 18, 1987) (victim knocked unconscious, raped and beaten to death).
[446] State v. Stenson, 132 Wash.2d 668, 940 P.2d 1239 (1997) (citing Gentry, 125 Wash.2d at 657, 888 P.2d 1105).
[447] Clerk's Papers at 883 (Special Verdict Aggravating Circumstances).
[448] RCW 10.95.030(2).
[449] Reports of Trial Judge, Luvene, Gentry, Benn, Harris (each finding death penalty not disproportionate based on a single aggravating factor); see also Reports of Trial Judge, Elmore, Jeffries, Mak, Hazen (death penalty not disproportionate based on two aggravating factors).
[450] Report of Trial Judge, March 10, 1998 at 3 lists an additional conviction of assault in the fourth degree (DV) in 1989 which is not included in the Report of Proceedings on (Feb. 10, 1998) at 2382-84.
[451] The death penalty has been imposed in cases where the defendant had little or no criminal history. See Report of Trial Judge, State v. Rupe (no criminal history); Report of Trial Judge, State v. Mak (no criminal history); Report of Trial Judge, State v. Luvene (no violent history and nonviolent character); Report of Trial Judge, State v. Stenson, (no violent history); Report of trial Judge, State v. Bartholomew (nonviolent theft, trespass and possession of stolen property); State v. Rice (nonviolent lewd conduct and grand theft auto); Report of Trial Judge, State v. Benn (nonviolent thefts, grand larceny and numerous misdemeanors); Report of Trial Judge, State v. Harris (two prior criminal convictions).
[452] Brown, 132 Wash.2d at 559, 940 P.2d 546 (quoting Pirtle, 127 Wash.2d at 688, 904 P.2d 245).
[453] Id. (citing Pirtle, 127 Wash.2d at 688, 904 P.2d 245).
[454] See, e.g., State v. Lord, 117 Wash.2d 829, 906, 822 P.2d 177 (1991) (jurors find despite drug and alcohol abuse and personality disorder defendant did not merit leniency); Brown, 132 Wash.2d at 553, 940 P.2d 546 (jurors find despite antisocial personality disorder defendant did not merit leniency, noting that the disorder explained, but did not excuse, his behavior.) cert. denied, 506 U.S. 856, 113 S.Ct. 164, 121 L.Ed.2d 112 (1992); Rice, 110 Wash.2d at 592-96, 757 P.2d 889 (jurors find despite personality disorder and no evidence of organic disease or brain abnormalities defendant did not merit leniency.); Hazen (jurors find despite organic brain disorder, child abuse and youth defendant did not merit leniency); Dodd, 120 Wash.2d at 11, 838 P.2d 86 (jurors find despite severe homosexual pedophilia defendant did not merit leniency); see also Brett (jurors find despite fetal alcohol syndrome and a difficult childhood defendant did not merit leniency); Pirtle (jurors find despite diminished capacity, defendant did not merit leniency).
[455] See Appellant's Br. at 38, 45-46.
[456] RCW 10.95.030(2)(a), (c).
[457] Report of Proceedings (Feb. 11, 1998) at 2464; Clerk's Papers at 924-25.
[1] Compare Majority at 1016 ("Appellant's argument merely reiterates the `means within a means' argument rejected by this Court in Personal Restraint Petition of Jeffries....") with Second Corrected Br. of Resp't at 92 ("Defendant's argument merely reiterates the `means within a means' argument rejected by this Court in Personal Restraint Petition of Jeffries." (citation omitted)); Majority at 1017 ("[T]his Court held that a jury instruction similar to jury instruction number 13 was incomplete because it and the special verdict form allowed the jury to find that either rape or kidnapping was the underlying crime.") with Second Corrected Br. of Resp't at 94 ("This Court held that the instruction was incomplete because the instruction (as well as the special verdict form) allowed the jury to find that either rape or kidnapping was the underlying crime."); Majority at 1017 ("There is no merit to Appellant's argument there was not sufficient evidence to support the various crimes against him ....") with Second Corrected Br. of Resp't at 95 ("[T]here is no merit to defendant's argument that there was insufficient evidence to support the various crimes....").